ROBERT MILLS v. ALEXANDER S. JOHNSTON AND ANOTHER.

A commission merchant, after having charged a commission for accepting a draft, may claim a further commission, for advancing money to pay the same, together with legal interest on the amount advanced.

He may also charge legal interest and a commission, on the amount advanced by him to pay a draft, not previously accepted.

Advances, made by a commission merchant, are not properly to be regarded as mere loans for the sake of interest, but as incident to the general business which he has undertaken to do, and for which he is entitled to charge a reasonable compensation.

To entitle a commission merchant to recover the commission charged, it must be a *bonâ fide* charge, for services rendered in the course of legitimate business; and not a cloak for the taking a higher rate of interest than the law permits. In the absence of express contract, it must be a reasonable compensation for the service performed. And these are questions of fact for a jury.

The custom of merchants in a particular place, may be given in evidence, to show that the charges are reasonable; but this is received as any other evidence; and the jury must be satisfied with the reasonableness of the charge.

When an account has been settled by note, the burden of proof is on the party who seeks to open the settlement.

Where one person, by request, pays the debt of another, which arose upon an illegal contract, the party paying it, although cognisant of the fact, is entitled to recover the amount paid, from the person at whose request the payment was made.

That one member of the firm, by whom the debt was paid, is also a partner of the firm to whom it was paid, does not affect the question.

So, where the debt has been voluntarily paid, a subsequent promise by the debtor, by the execution of his notes, is a ratification of what has been done, and equivalent to a previous request.

Mills v. Johnston.

The law will not look to the mere form in which accounts are kept, to ascertain whether there is usury in a subsequent settlement.

Nor will it impute usury to a settlement, because the parties have agreed to compound interest; this, if not intended as a cover for usury, is not unlawful.

But it will look at the whole amount of interest reserved, and any illegal charges for commissions, and if these together, independent of legal commissions, do not exceed the highest interest allowed by law, for the whole period of forbearance, it cannot be held to be usurious.

A commission merchant cannot charge a commission on a " dry balance," *i. e.*, the balance due upon the old, and passed to new account, as a new advance.

APPEAL from Galveston. Tried below before the Hon. Peter W. Gray.

In this case, two suits, (which were subsequently consolidated,) were commenced by the appellant, against the appellees, Johnston & Dewbury, one on a note of the appellees, due March 1st, 1854, for $11,721.69, upon which were sundry credits; the other, on a note of the appellees, due March 1st, 1855, for $8800, without credits; both of these notes were payable to the appellant.

The appellees pleaded, (among other matters, not necessary to be noticed,) that the notes sued on, and another note for $12,000, due March 1st, 1853, and which had, since that time, been paid, were given in settlement of certain accounts, with the firms of Mills, McDowell & Co., in New York; McDowell, Mills & Co., in New Orleans, and R. & D. G. Mills, in Galveston, of all of which firms, the appellant was a partner. The appellees alleged, in their answer, that there was usury in the transaction, by said Mills, McDowell & Co., with them, by charging and receiving not only seven per cent. interest per annum, the full legal rate of interest allowed by the law of New York, but also the further sum of two and a half per cent. for accepting, and two and a half per cent. for advancing, on the loans and advances made by the said house to the appellees; setting out and pleading the law of New York. Also, alleging that there was usury in the transactions of the firm of McDowell, Mills & Co., of New Orleans, with

them, by charging on advances, interest at the rate of ten per cent. per annum, besides a commission of two and a half per cent. for accepting, and two and a half per cent. for advancing and paying drafts drawn by them; also setting out in their answer, the law of Louisiana, by which eight per cent. per annum, is the maximum of interest, for which the law permits parties to contract.    And also alleging, that there was usury in the transactions between the house of R. & D. G. Mills and themselves, by charging and receiving on the settlement, when the notes sued on were given, ten per cent. interest per annum, and two and a half per cent. for accepting, and two and a half per cent. for advancing and paying the drafts drawn by the appellees on said house, and by further charging two and a half per cent. on balances, as upon and for a new advance.

The answer further alleged, that the said notes were alone founded upon said usurious contracts, agreements, loans, &c., and claimed the enforcement of the penalties provided by the statutes referred to; set up payments that had been made, and claimed that they should be applied to the legal and valid portions of the debt, and asked, by plea in reconvention, for judgment, for such sums as they might have overpaid the amount justly due.

Without setting out the accounts between the appellees and the said firms, referred to in their answer, and which were presented in evidence upon the trial, it will suffice to observe, that they exhibit the usual business transactions between merchants in the interior, (as the appellees were shown by the testimony to be,) and commission houses at the various sea-ports, and commercial marts mentioned; such as receiving and making sales of produce on and for a commission, and making advances and loans of money, sometimes upon sight drafts, but oftener upon acceptances of the drafts of the appellees, payable at a future day.

It also appeared from the said accounts, that on the 20th of March, 1852, the balance claimed to be due from the appellees, by the house of Mills, McDowell & Co., was settled by R. & D. G. Mills; who also, on June 8th, 1852, settled the balance

claimed against them by the house of McDowell, Mills & Co.; and these amounts were subsequently charged by the said house of R. & D. G. Mills in their accounts rendered against the appellees; and that the amount claimed by the last named firm was settled, on June 9th, 1852, by the appellees executing to the appellant the two notes sued on, and the note for $12,000, as alleged in the answer; and the account was then charged in the books of said R. & D. G. Mills, to the appellant, and the notes given entered to his individual account.

Upon the trial, a jury was waived, and the case submitted to the judge, by whom it was held, that there was no usury in the account of Mills, McDowell & Co., before the same was entered on the account of R. & D. G. Mills, and that the amount of the said account, was a valid item of principal, on which no interest should be allowed, after its entry on the account of R. & D. G. Mills. That there were usurious charges, under the laws of Louisiana, in the account of McDowell, Mills & Co., viz: ten per cent. interest, and two and a half per cent. commission for advancing; and that the interest and commission should be deducted, and also the payments, and that the residue was a valid item of principal, upon which no interest should be allowed. That the charge of two and a half per cent. for accepting, and two and a half per cent. for advancing, in the account of R. & D. G. Mills, were valid charges, but that the charge of two and a half per cent. on the "dry balance," in their account of December 31st, 1851, was usurious, and should be deducted, together with all interest on their account subsequent to that time; and the court, after passing upon some other questions, as to payments and credits, which it is unnecessary to particularize, re-stated the account between the parties, and found a balance of $489.96, in favor of the appellees, for which judgment was rendered in their favor.

From this judgment, both parties gave notice of appeal, but the appellant alone perfected his appeal, by giving bond and assigning errors.

*O. C. & R. K. Hartley,* for the appellant.—1. The most important inquiry is, whether the judgment of the court below is correct, in imputing usury to the notes, on account of the item of commissions, charged in the account of R. & D. G. Mills, on the 31st December, 1851.

The theory of the decision is, that if any one item of the account was for the forbearance of money, the notes were usurious, without respect to the rate of interest reserved by the account, as a whole, on the money advanced. We say such is the theory of the decision, because the principles which the court below formally determined, refer directly to the " dry balance item" as the offender ; and because a simple calculation, so simple that it may be done by mental arithmetic, will show, that the account of R. & D. G. Mills, did not reserve twelve per cent. per annum, including all the commissions charged, lawful or unlawful.

The error of the court below, in this particular, is easily accounted for. Where there is no distinction between legal and conventional interest, and there is, therefore, a general charge of the highest rate allowed by law, it would follow, from a single item of charge of commissions, which was really for forbearance, that the account, and the notes taken on final settlement of it, would reserve more than lawful interest, unless the offending item were struck out ; and, as the said " dry balance item," retained its place in the account, if there had been a general charge of the highest rate of interest allowed by law, it would have followed, if the said special charge was substantially for forbearance, (waiving the question of corrupt intent,) that the notes were infected by it, unless the plaintiff could show that it had been paid before the notes were taken.

A superficial examination of the authorities on the subject of usury, results, naturally enough, in the error which we have just described. Our libraries are filled with books written, and decisions made, under laws which know only one rate of interest, *which is always accruing by contract, express or implied.*

Where a contract contains distinct stipulations for the pay-

ment of interest, some of which are usurious, and others not, the nullity of the former will not attach to the latter, when the court can see clearly, from the contract itself, those parts which are legal and equitable, and should be enforced, and those for which the law gives no action. (Compton v. Compton, 5 Ann. La. Rep. 620.)

The settlement in which the notes were taken, and the notes, constituted a contract of accounting, all the items of which distinctly appear.

In this case, the unlawful interest was abated on only one item in the account, and for the time only to which the usurious stipulation pertained. (Leland v. Beaux, Id. 505.)

In this case, the commissions for advancing were merely disallowed. (Ledoux v. Groza, 4 Id. 161.)

When the transaction is of such a nature, that the good part of the consideration can be separated from that which is bad, the courts will make the distinction. (2 Kent, 468, and authorities there cited; Frazier v. Thompson, 2 Watts & Serg. 235; see Heckert v. Fegely, 6 Id. 145.)

As to payment, by the application of the items of the credit side of the account, see the following authorities, which show that the mode in which these accounts were kept, was an application of the items on each side, *pari passu*, commencing at the beginning: (Clayton's Case, 1 Merivale, 608; Bodenham v. Purchas, 2 B. & A. 39; Harr. Dig. vol. 2, p. 2338; Allen v. Culver, 3 Denio, 290; United States v. Kirkpatrick, 9 Wheat. 720; Upham v. Lefavour, 11 Met. 174; Postmaster General v. Furber, 4 Mason, 333.)

In this case, the court held that where the accounts were kept in same manner as here, the first items on the debit side, even including alleged usurious charges, were paid by the first items on credit side. (Seymour v. Marvin, 11 Barbour, S. C. Rep. 80.)

Waiving, for the present, the fact, that all the circumstances of these transactions do not merely fail to afford any proof of a corrupt intent to take unlawful interest, but, on the contrary, refute to the uttermost, any such charge, we will, before passing

to another point in the case, illustrate our position, that the notes sued on contain no contract to pay unlawful interest.

For the purpose of the illustration, we must suppose, that as a court of law, in deciding on the validity of a contract for interest, will refer it to the highest rate of conventional interest, so a court of equity would do, in deciding the same question. Of this there can be no question. But we must further suppose, that the debtor is applying in a court of equity for relief against the usurious excess. What would that be in this case? How would a court of equity proceed to ascertain it? Simply, of course, by taking the money advanced, and the money repaid, and computing interest at twelve per cent. per annum, ascertain the result.

Does it not follow, that if a court of equity would find nothing to relieve from, a court of law will find nothing to pronounce unlawful? That would seem to be a proposition which can stand alone, under any circumstances.

2. We will now pass to the consideration of the objections to the New Orleans account, and to the effect given to those objections.

1st. In the first place, there is no proof of any contract, in violation of the laws of Louisiana. To constitute such violation, it is necessary to find, not merely a contract to pay more than was allowed by the laws of that state, but further, that such contract was corruptly made in violation of the laws of that state, which has been construed to mean the same, in law, as an intent knowingly to violate the law of that state. (Planters' Bank v. Snodgrass, 4 How. Miss. Rep. 573; Bank U. S. v. Waggener, 9 Pet. 378.)

The usual proof of such intention, in such cases, is, that the contract was made there, and was not made with reference to the laws of another state, where such contract would be lawful. (Peck v. Mayo, 14 Verm. 33, in 2 Parsons on Cont. 96, note; Chapman v. Robertson, 6 Paige, 627; 2 Kent, 57; Depau v. Humphreys, 20 Mart. 1; Story's Confl. Laws, § 292.)

Now what is the evidence of a corrupt contract to violate the laws of Louisiana?

McDowell, Mills & Co., rendered the defendants services and advanced them money, and sent them an account in which unlawful charges were made, imputable to interest only.

That this would not amount to proof of a usurious contract, even if unrebutted, and both parties resided in Louisiana; see Barrett v. Chaler, 2 Ann. La. Rep. 874; Ledoux v. Goza, 4 Id. 161.

And the account was sent to the defendants, residing in Texas; and there are two answers to any attempt to infer an agreement from their failure to object, even if they did fail, which should have been proved by the defendants.

First. The court will not infer, from silence, an agreement to pay an unlawful demand.

Second. That if such assent be presumed, by the silence of defendants, then it was given in Texas, where the contract would have been lawful; where it was lawful, having in view the laws of Texas, and not of Louisiana.

In case of contracts made between persons who are absent from each other, the contract is considered as consummated in, and governed by the law of, the country where the final assent is given. (Whiston v. Stodder, 8 Mart. 135; Shaw v. Oakey, 3 Rob. 361.)

2d. If the question were doubtful, the court would presume that the contract was made with a view to the laws of the state, under whose laws it would be valid. (Bank of Louisiana v. Briscoe, 3 Ann. La. Rep. 157; Compton v. Compton, 5 Id. 619; Succession of Jenkins, Id. 682; 3 Cowen, 284.)

3d. The credit was obtained from the firm of R. & D. G. Mills, in this state, where the defendants resided; the account was paid by the firm here, and charged against the defendants in the account of the firm in this state, at rates agreed on here, and the whole was closed by settlement in this state, by notes payable in this state, to the member of the firm in this state, at whose instance the credit was opened. (Peck v. Mayo, 14 Verm. 33, in 2 Parsons on Cont. 96, note; Chapman v. Robertson, 6

Paige, 627; 2 Kent, 57; Story's Confl. Laws, § 292; Depau v. Humphreys, 20 Mart. 1.)

4th. If it were admitted that there was a corrupt contract, in violation of the laws of Louisiana, to pay unlawful interest, it would not follow therefrom, that a new contract, made in another state, having such unlawful contracts for its consideration, could be impeached on that account.

An error of the court below, on this part of the case, was, in supposing that the rule was the same as if we were suing on the first and unlawful contract. It is undoubtedly true, that a contract which is invalid, not by the laws of the place where it is made, but by the laws to which it is legally referable, is invalid everywhere; but it is equally true, that a contract which is valid by the laws to which it is legally referable, is valid everywhere. In determining whether a contract made in this state is lawful, the sole inquiry is, whether it violated the laws of this state, unless it be legally referable to the laws of another state. Now, to hold that notes given in this state, between citizens of this state, and expressly payable in this state, are referable, for their validity, to the laws of Louisiana, would be simply absurd. It could not be done, even to *sustain* the contract, if such would be its effect; much less can it be done in order to invalidate it.

" But, suppose a debt is contracted in one country, and afterwards, in consideration of farther delay, the debtor in another country enters into a new contract for the payment of interest upon the debt, at a higher rate, than that allowed by the country where the original debt was contracted, but not higher than that allowed by the law of the country, where it is so stipulated; it may be asked whether such stipulation is valid? It has been decided that it is." (Story's Confl. Laws, § 293; Connor v. Bellamont, 2 Atk. 382; and see De Wolf v. Johnson, 10 Wheat. 385.)

*Ballinger & Jack* and *L. A. Thompson*, for the appellees.— 1. Our first position is, that the charge of two and a half per

cent., for advancing or paying money by the acceptors, (in addition to the agreed commissions for their previous acceptance,) is usurious. (Daquin v. Cairon, 3 La. Rep. 393; 1 Annual Rep. 265; 2 Id. 876; 5 Id. 505; Id. 547; New York Dry Dock Co. v. Am. L. I. & T. Co., 3 Sandf. Ch. 259, 260, 261; affirmed on appeal, 3 Comstock, 344; Smith & Co. v. Bull's Executors, 5 B. Monroe, 146–151; Pollard v. Baylor's Devisees, 4 Hen. & M. 223.)

The charge for accepting, is the compensation for the assumed responsibility, risk, trouble and service of the acceptor. It then becomes his debt. He must prepare himself to pay in default of the drawer. The law imposes this duty on him, and the holder looks to him. Inasmuch, as between the drawer and acceptor, the duty of the former is to provide funds, and as the acceptor has a right to expect him to do so, and not be obliged to pay, it allows him a reasonable compensation for the risk which he takes, and the trouble he must be at to prepare himself to pay.

This is the only reasoning on which such commission can be allowed. To say that it is for the mechanical act of *signing the acceptance*, would be frivolous. It is for the duties which the acceptance imposes, the liability to pay, and the preparation to pay. When this compensation has been provided, this commission charged for the acceptance, it seems to us most apparent, that no mortal ingenuity can give any other character to a further charge or commission for advancing or paying the money, than that it is a charge or premium for the loan or use of such money.

In Trotter v. Curtis, 19 Johns. 160, the charge of two and a half per cent. for *accepting and paying* was sustained, and this we admit to be correct. Seymour v. Marvin, 11 Barb. 80, is also relied on by appellant. The fact, that the advance was to be paid in skins, &c., at a commission of five per cent., which was the commission for sales, seems to have influenced the court; but so far as it conflicts with the case in 3 Comstock, 344, it is the decision of an inferior court, and not authority.

The Louisiana decisions are entitled to peculiar weight on this

subject.   New Orleans is the great commercial emporium of the south-west, where the system of *advances* to planters and interior merchants is more practised than in all the balance of the Union. Its deleterious effects, the utter dependency to which it reduces the planters, the sacrifices to which, under the guise of commissions, they are compelled to submit, are there most strongly exemplified and best understood.   The courts, to their great credit, have vindicated the law on this subject, against the powerful influence of the mercantile class in New Orleans.   As matter of truth or law, it is idle to give to these charges any other complexion than a charge for money, and the true question is, whether a body of men may combine together, and frame charges and customs of their own, whereby they can set at nought the laws of the land based on its most essential policy.

Our second point of objection to the New York account is, to the item of payment of check March 18th, 1851, in favor of Otis & Underwood, for $1083.07, on which seven per cent. interest, and two and a half per cent. for advancing, is charged. Here was a payment of cash on the check of Johnston & Dewberry, on the 18th of March, when they had no produce in hand, and could not have expected any, for which a commission is charged for the advance, and full interest from date.   Can any other complexion be given to this, than that it is a charge of nine and a half per cent. for money, where only seven was legal?

2. The New Orleans account is usurious.   This, upon its face, will not be disputed.   The highest rate of conventional interest in Louisiana is *eight* per cent., whilst the account is made up at ten per cent. interest, besides the charge of two and a half commission for accepting, and two and a half for advancing, which latter has been repeatedly decided in Louisiana to be a *charge of interest*, and usurious, if it swelled the interest above the highest conventional rate.   (See Daquin v. Cairon, 3 La. Rep. 393, and authorities before cited.)

3. An effort, however, has been made to show that these New Orleans and New York accounts, in their inception, and throughout, were substantially *Texas transactions*, and should

be determined by the laws of this state. The facts, without exception, are clearly the other way. The letters of R. & D. G. Mills and R. Mills to McDowell, Mills & Co. and to McDowell, were letters of introduction and business credit; the substance of them being, that they held bills of lading for three hundred bales of cotton, belonging to Johnston & Dewberry, to be shipped by a vessel in port, and expected one hundred and fifty more; that they had advanced eight or nine thousand dollars, and Mr. Johnston would want the balance from the New Orleans or New York houses, and also, probably, further facilities, which, considering them to be amply responsible, and that their business would be large and desirable, they requested to be extended. But the amounts or terms, or arrangements for the advances, were not agreed upon in Texas; but left to be arranged and stipulated in New Orleans or New York. Says Mr. Mills, in the private letter, to Mr. McDowell: "Mr. Johnston would have called, *and had some talk*, but, no doubt, he is very busy trying to get off. I, therefore, *state his case for your guidance*. Advise James, (the New York partner,) of what you may do, so that he may know how to act."

It is clear, that the advances were made *in* New Orleans and New York, by the houses there, and were *there* to be repaid upon contracts *there* entered into.

In every feature, they are New Orleans and New York contracts, and to be governed by their laws. The accounts show the carrying out of the contract on this basis, shipments and remittances made to New Orleans and New York, to cover the advances; and the letters from Mills, McDowell & Co., of September 26th, and October 30th, 1851, and from McDowell, Mills & Co., of 8th November, 1851, and 8th May, 1852, show, conclusively, that the accounts were to be paid at those places. It may be true, that R. & D. G. Mills were responsible for these accounts, and on failure of Johnston & Dewberry, paid them. Does that change the character of the contracts or accounts themselves, or make them the less New Orleans and New York accounts? What did R. & D. G. Mills request through these letters?

The opening of these very accounts. If responsible, what did they guaranty? They guarantied these accounts in manner and form as they existed between Johnston & Dewberry, and the New Orleans and New York parties. Their liability was collateral and incidental to the principal contracts. They guarantied accounts which were to be contracted and liquidated in New York, and according to the proof of McMuller, they were so paid. (De Wolf v. Johnson, 10 Wheaton, 367.)

. It was contended, in the court below, that no *agreement* existed to pay the ten per cent. interest and commissions, charged in the New Orleans account, *prior* to the execution of the notes by Johnston & Dewberry, and that the execution of those notes, including that interest and commission, was the *first* agreement or contract on the subject.

In this connexion, reference is made to the following authorities: Payment and receipt of usurious interest is *primâ facie* evidence of usurious contract. (2 Parsons on Contracts, 394; 1 Wms. Saunders, Rep. 295 *b*; N. Y. Firemen's Insurance Company v. Ely, 2 Cowen, 705; Harp v. Chandler & Neel, 1 Strobhart, 468; Wright v. Eliot, 1 Stewart's Rep. 391.) Payments made in accordance with course of dealing, though there be no express agreement, show tacit agreement. (Quarles v. Brannon, 5 Strobhart, 155.) One party charging, and the other allowing, unlawful interest, proves corrupt agreement. (Powell v. Waters, 8 Cowen, 669.) .

4. The Texas accounts with R. & D. G. Mills are usurious.

1st. We ask particular attention to the first account. It extends from November 21st, 1850, to June 30th, 1851. On the 21st November, R. & D. G. Mills paid them cash $3000; December 14th, cash $5000; February 1st, $549.47; March 10th, $700; April 9th, $400; May 12th, $235. On these advances they charged interest at the rate of ten per cent. per annum, and *two and a half per cent. for the advance,* making a charge of $759.55, for the use of the money during that period. Whilst the highest rate of legal interest, twelve per cent. from the date of these advances to the 1st of July, would have been $614.84. Take

the whole account, and the aggregate of the interest at twelve per cent. on all the items, would have been $697.58, whilst the actual charges of interest and commissions for cash advances, were $828.43. Now, we say, that upon no sound reasoning or authority, can any other effect be given to the charge of two and a half per cent. on cash advanced, than that it is compensation for the use of the money, and it renders this account usurious. (Durham v. Dey, 13 Johnson, 49; Durhan v. Gould, 13 Id. 367.) The case of Brown v. Harrison & Robinson, 17 Ala., (N. S.) 774, recognises that if the money had been advanced on the draft, and not an acceptance given, which the drawer was to take up, in other words, a loan of credit, it would have been usurious. (Id. 776, 777.)

2d. The second account of R. & D. G. Mills, extends from July 1st, 1851, to January 1st, 1852, and compounds the interest at the end of six months on the previous account. Taking no exception to this, the interest at the rate of twelve per cent. would have amounted to $744.97. But by the fiction of considering the balance due on the 1st of July, as then *re-advanced*, and charging two and a half per cent. commissions therefor, and at the rate of ten per cent. interest, the charges on this account amount to $958.85. We cannot permit ourselves to doubt, that this court will agree with the court below, in the belief that this account is manifestly usurious, and from thence the usurious balance being carried forward, and entering into all the subsequent balances, the accounts are subject to the legal consequences of usury. Ord, in his work on Usury, in enumerating the devices to obtain usury which are unlawful, says: "By what was called *dry exchange;* in which case the borrower, for securing the repayment of the money lent, drew a bill of exchange on some fictitious person, supposed to be in a foreign country, the bill was never sent abroad; but a protest was obtained for non-payment of it when due, and thus the borrower was charged with exchange, re-exchange and other incidental expenses, over and above legal interest." (Ord on Usury, 65, 66.) The charge in this case is known among commercial men, as commissions on a

"*dry balance*," on the fiction of a new advance, and stands on the same principle.

But, it has been insisted by counsel, that this court will *look through*, what he designates the *forms* of this contract, and ascertain its *substance;* and, if from the time of *opening the account* down to the *maturity of these notes*, more than twelve per cent. interest per annum was not charged in the aggregate, then there is no usury. If it be meant, by disregarding the *forms* of the contract, that the court are at liberty to disregard the actual contract itself,—to shut their eyes to the intentions, acts, and writings of the parties themselves, and set up some *other* contract, and attribute to the parties motives and objects, which did not exist in their minds, then we deny altogether any such inclination, or any such power in the court. Its object will be to ascertain what was *in fact*, the contract between the parties, as it actually took place, and was intended and understood by them; and to decide the law applicable to that contract.

5. If we were correct in our first proposition, that the New York account was usurious, then inasmuch as by the law of New York, proved in this case, the entire contract was void, no part of that account, (the usury not having been expunged,) could constitute a good consideration for a contract in Texas, and the whole account should have been rejected from plaintiff's demand. This has been sufficiently argued.

6. The transfer and renewal of the New York and New Orleans indebtedness to R. & D. G. Mills, or rather to R. Mills, the plaintiff, does not change the effect of the usury.

R. & D. G. Mills had full notice thereof, which of itself would place them in the same position; but the plaintiff, R. Mills, was a partner in both the New York and New Orleans houses; and the only partner of the Texas house interested in the transaction of receiving the transfer or taking up the New York and New Orleans accounts. McMuller's testimony shows Jockusch had no interest in the matter. The case then was, usurious contracts made in New York and New Orleans, by houses in business there, governed by their laws in every feature, and renewed in

Mills v. Johnston.

Texas by one of the partners, with all their usury. His being a partner, resident in Texas, cannot be material. If, in his own person, or through his partners, he violates the laws of other states, he cannot introduce such illegal contracts into this state, and make them the consideration of valid obligations. On this point we refer to the following authorities: (Chapman v. Black, 2 B. & Ald. 589; Tuthill v. Davis, 20 Johns. Rep. 285; Morton v. Le Grand, 2 Littell's Rep. 326; Whitehead v. Peck, 1 Kelly's Geo. Rep. 140; Hargrave v. Lewis, 2 Id. 167; Jones v. Joyner, 8 Id. 562.)

BELL, J.—The commission business is the creature of agriculture and commerce, and has grown up in all the great centres of trade throughout the United States. The commission merchant finds his proper and necessary place between the farmer or planter, who tills the soil, and produces crops, and those by whom the productions of the earth are manufactured or consumed. To state that this kind of business is necessary to agriculture and commerce, is at the same time to state that the laws of the country extend their protection to it. The most enlightened courts of the Union have adjudged, that the commission business is a lawful business, and that the commission merchant is as much entitled to a reasonable compensation for any services that he may render to those with whom he transacts business, as any other person is entitled to be paid for any other service. Embarrassing questions, growing out of the local usages of commission merchants, have sometimes been presented to the courts. But these questions are all solved by the application of a few plain and intelligible principles. The question, whether or not a commission merchant is entitled to charge a certain commission in a given case, is answered, by ascertaining whether or not the commission charged is a fair and reasonable compensation for a service rendered. If it be fair and reasonable, then it may be charged, and recovered by law. If it be unreasonable or exorbitant, then, in the absence of such a special contract as would preclude inquiry into its fairness and reasonableness, it cannot

be recovered by law. Again, if the name of commission be used as a disguise for some other thing, which the law does not permit, the courts will have no regard for the mere name, but will strip the unlawful thing of its borrowed name, and condemn it by its true name. But we will proceed from these general observations, to the consideration of the case itself.

The court below held, that there was no usury in the account of Mills, McDowell & Co., of New York, before the same was entered on the account of R. & D. G. Mills, Galveston. The counsel for the appellees contend, that there was error in this ruling of the court, and they assume two positions, to show that there was usury in the New York account. The first of these positions is, that the commission merchant, after charging a commission for accepting a draft, has no right to charge a further commission for paying it. The second position is, that the commission merchant has no right to charge a commission for paying a draft, where there has been no previous acceptance, as in the case of a draft payable at sight. We will notice both these positions together. It is important to bear in mind, that the mere lending of money for the sake of interest, is no part of a legitimate commission business. But in conducting a legitimate commission business, the merchant must pay out money for the accommodation of his customer; and in order to do this, he must keep money of his own constantly on hand, or he must borrow, to meet exigencies when they arise. The transactions between the commission merchant and his customer, are properly to be regarded as a whole. It will not do to select a single transaction, as for instance, an advance of money to meet a sight draft—it will not do to select such a transaction from a long series of transactions—to say, here is a loan of money, and more interest is reserved for it than the law allows. For to do this, is to lose sight of the real nature of the dealings between the parties. The commission merchant undertakes to keep his customer's account. Incident to the business of receiving and selling crops, or of purchasing and forwarding goods, is the paying out of money for freights, for articles purchased in pursuance of

orders, and the like. The customer sometimes wants a sum of money to meet the exigencies of his business. The commission merchant advances the money, not as a mere loan for the sake of interest; not ordinarily, in the expectation that it will be repaid in money; he makes the advance as an incident to the general business which he has undertaken to do, and in the expectation that he will be repaid, out of the proceeds of crops or other goods, placed in his hands for sale. It is presumed, that the merchant's money is worth the interest which the law allows him to charge for it; and because he is liable to be called on to advance it, when it may be inconvenient for him to do so; because he may be obliged to borrow it, in order to accommodate his correspondent; because he does not lend it for the sake of interest; because he has no intent to violate the law by taking usurious interest; and because he has the trouble of keeping his correspondent's account; he is allowed to charge a reasonable commission for these advances, as an incident to his general business, which has grown up out of the necessities of agriculture and trade. Ordinarily, when the commission merchant makes an advance of money to his customer, he does it without any special security for its repayment. All these considerations tend to show, that such advances are not properly to be regarded as loans of money, for the sake of interest.

When a commission merchant accepts the time draft of his customer, he charges a reasonable commission for the accommodation then expended. He does his customer a service, and he is entitled to a reasonable (but to no more than a reasonable) compensation for this service. By the acceptance, he becomes responsible to the drawee of the bill for its payment, when it matures. But as between himself and the drawer of the bill, there is an understanding that the drawer will place him in funds for the payment of the bill at its maturity. If, then, the drawer does not perform this part of his agreement, and the merchant be obliged to advance his own money to pay the bill, then he has done something more than he undertook to do, as between himself and the drawer of the bill. He has not only lent his

credit by the acceptance, and thus accommodated his customer, which is supposed to be worth something, but he has now provided his own funds, and paid what the drawer of the bill agreed to pay, and this service is supposed to be worth something more.

The question for the court is, how much is the whole service rendered by the commission merchant, reasonably worth? If it is only worth two and a half per cent., to accept a draft and to pay it, then the merchant can recover no more. If it is worth five per cent. to accept and to pay, then the merchant can recover that much. In determining whether or not the commission merchant can recover a commission charged or not, there are two questions to be submitted to the jury. The first is, whether the charge is really a *bonâ fide* claim of compensation for a service rendered in the regular course of a legitimate business, or is it a cloak for the taking of a higher rate of interest than the law permits? If it be usury in disguise, the law puts upon it, unhesitatingly, the seal of its condemnation. If it be no usury, but a *bonâ fide* claim of compensation for a service rendered in the course of a legitimate business, then the next inquiry is, concerning the reasonableness of the charge. If it is reasonable, and no more than a fair compensation for the service performed, then it may be recovered, otherwise not. These questions are always questions for the jury. The cases have established, that the custom of merchants in a particular place, may be given in evidence, to show that the charges in the particular case are fair and reasonable. But evidence of this custom is received like any other evidence. The jury must be satisfied that the commission charged is a reasonable one, or it cannot be recovered. We have thought it proper to lay down these general rules, because they seem to us to be sound deductions from the best considered authorities, and consonant with reason and justice. (See cases of Trotter and Douglas v. Curtis, 19 Johnson, 160; Brown v. Harrison and Robinson, 17 Ala. Rep. N. S. 778; Seymour v. Marvin, 11 Barb. Sup. C. Rep. 80; Hutchinton v. Hosmer, 2 Conn. 341; Floyer v. Edwards, decided by Lord Mansfield, Cowper, 112; Ketchum v. Barber

and others, 4 Hill, 224.) In the case before us, the New York account had been transferred to the Galveston house, and was included in the settlement made at the time of the execution of the notes. There was no evidence of the reasonableness or unreasonableness of the charges for commissions contained in the New York account; and as the burden of proof, after opening the settlement made by the execution of the notes, was upon the appellees, there is no reason shown for questioning the correctness of the decision of the court below, that there was no usury in the New York account. There is another ground on which the objections, made by the appellees to the settlement, so far as both the New York and the New Orleans accounts are concerned, may be met and repelled, and we have only discussed this question of the legality of these commissions, for accepting and advancing, in this part of the opinion, because the question properly arises upon the Galveston account, which we will presently proceed to consider.

In reference to the New York and New Orleans accounts, the evidence is satisfactory, that they were fully paid by the Galveston house, after they were transmitted to that house by the firms in New York and New Orleans. McMuller, the financial clerk of the Galveston house, says in his testimony, that these sums were paid by remittances made by the Galveston house, to cover balances against the firm in Galveston, in favor of the other firms. We take it to be a well established principle, that where one person, by request, pays the debt of another, although the debt so paid may have arisen upon an illegal contract, the party who pays it, is entitled to recover it back from him, at whose request it was paid. Lord MANSFIELD laid down this rule clearly, all the other judges concurring, in the case of Faikney v. Reynous and another, 4 Burrow, 2069. We cannot perceive that the fact that Robert Mills was a partner in all the houses, can affect the case, or interfere with the application of this principle. A member of a firm may contract debts with the firm, and may make payments to the firm, in the same manner that any other person may. But these New York and New Orleans

accounts were not paid by Robert Mills; they were paid by the firm of R. & D. G. Mills, of Galveston, of which firm John W. Jockusch is shown to have been, at the time, a partner. Mr. Jockusch was not a partner in the New York and New Orleans houses. The firm of R. & D. G. Mills, of Galveston, had a large account against the appellees, in addition to the New York and New Orleans accounts. We think, under these circumstances, that the payment of the New York and New Orleans accounts by the firm of R. & D. G. Mills, entitled that firm to recover those amounts from the appellees, even if there were usurious charges in said accounts. In the case in 4 Burrow, Lord MANS-FIELD said: " If money be lent in order to pay a play-debt, or in order to pay off an usurious contract, or even to lend out upon usury, and a bond be given for securing the repayment of the money so lent, such a bond will not be void; the obligor will be bound to pay it." This same principle was emphatically and distinctly asserted by Chief Justice MARSHALL, in the case of Armstrong v. Toler, 11 Wheaton, 258. In this case, the Chief Justice reviewed the authorities upon the point involved.

But it may be said, in the case before us, that the firm of R. & D. G. Mills, paid these New York and New Orleans accounts, voluntarily, and without authority from the appellees. That may be so, but the subsequent promise to pay, upon the execution of the notes, was a ratification of what had been done, and takes this objection out of the mouths of the appellees. Chief Justice MARSHALL met this point precisely, in the case of Armstrong v. Toler. He says, " That the person who paid the money knew it was paid in discharge of a debt not recoverable at law, has never been held to alter the case. A subsequent express promise is, undoubtedly, equivalent to a previous request."

We think, then, that the payment of these New York and New Orleans accounts, for Johnston & Dewberry, by the firm of R. & D. G. Mills, of Galveston, and the subsequent recognition of that payment, and the ratification of it by Johnston & Dewberry, when the notes were executed, places those matters upon precisely the same footing as if R. & D. G. Mills had paid these

Mills v. Johnston.

accounts upon the previous request of Johnston & Dewberry; and we think that Johnston & Dewberry are estopped from saying that there was usury in those accounts, and that they were not bound to pay them.

Then the remaining question for our determination is, whether or not, there was any usury involved in the settlement, so far as the Galveston account was involved therein, and so far as the transactions of the parties were concerned, after the consolidation of all the accounts into one. And here we will notice a position assumed throughout their whole argument, by the counsel for the appellees. It is, that the appellees contracted to pay, in the precise manner in which the accounts were kept, and, consequently, if one unlawful charge entered into the account, it infected the whole account, from that time forth. This position cannot be maintained. In the absence of express contract, (and there is no express contract shown in this case, except the execution of the notes,) the law will not imply a promise to pay what is unlawful. It will imply a promise to pay what is fair and reasonable, and therefore lawful; but it will not imply a promise to pay what is usurious, and, therefore, unlawful.

There is one other principle which it is, also, necessary to keep in view, and that is, that the compounding of interest, by agreement, and where it is not intended as a cover for usury, is not unlawful.

Upon the question, then, whether or not there was usury involved in the settlement between these parties, after the consolidation of all the accounts, we have to say: 1st, The law will not look to the mere form in which accounts are kept, to ascertain whether there is usury in a subsequent settlement, or not. 2d, The law will not impute usury to a settlement, because the parties have agreed to compound interest upon a sum fairly due. And lastly, The law, in deciding whether a settlement involves usury or not, will look at the whole amount of interest reserved, as distinct from such commissions as are allowable and recoverable by law, and to the whole period of forbearance expended; and if the charges, properly imputable to interest, do not exceed the

highest interest allowed by law, for the whole period of forbearance, then the settlement cannot be held to be usurious.

In applying these principles to the settlement before us, we find that the whole amount of interest reserved, including the "dry balance item" of 31st December, 1851, by the settlement, does not amount to twelve per cent. per annum, upon the sums due, for the whole period of forbearance extended.

The evidence shows, that the commissions charged in the Galveston account, except the "dry balance item" of December 31st, 1851, were usual and reasonable commissions. These commissions are, therefore, not to be imputed to interest. We cannot perceive any sound principle on which the commission on dry balances can be sustained. It has reference to a past transaction; and, although, in a given case, it may be said to be equitable, still it is but another mode of declaring that the merchant's money is worth more than the law allows him to retain for it. This charge of commission on dry balance, then, in the Galveston account, must be imputed to interest; but it will not swell the whole interest to twelve per cent. for the whole period of forbearance. Looking, then, from the form of things to their substance and effect; from the form of the accounts, as kept by one of the parties, to the substance of all the transactions between them, we can find no usury. We conclude, therefore, that the court below erred in the views taken of this case, on the trial below.

We see nothing in the evidence to warrant a conclusion, that the court below erred as to the questions of fact involved in relation to credits and payments. The judgment of the court below, will be reversed, and this court will render such judgment as ought to have been rendered by the court below.

Reversed and reformed.