Mr. Justice Cox
delivered the opinion of the court.
These were separate actions brought by the District of Columbia against 'the Washington and Georgetown Eailroad Company and the Metropolitan Eailroad Company respectively.
The charters of these two companies were passed respectively in the years 1862 and 1864. The charter of the Washington & Georgetown'Eailroad Company contains, in its fourth and fifth sections, the following provisions :
Sec. 4. “That the said corporation hereby created shall be bound to keep said tracks, and for the space of two feet beyond the outer rail thereof, and also the space between the tracks, at all times well paved and in good order without expense to the United States or to the cities of Washington and Georgetown.”
Sec. 5. “That nothing in this act shall prevent the government, at any time at their option, from altering the grade or otherwise improving Pennsylvania avenue and such other avenues and streets as may be occupied by said roads, or the cities of Washington and Georgetown, from so altering or improving such streets and avenues as may be under their respective authority and control; and in such event it shall be the duty of said company to change their said railroad so as to conform it to such altered grade and pavements.”
The provisions of the fourth and fifth sections of the charter of the Metropolitan Eailroad Company are substantially the same as those of the Washington & Georgetown.
The declaration in each case set forth the defendant’s charter, and in substance avers that the defendant failed to execute the work required of it by its charter, and the plaintiff was therefore compelled to cause the work to be executed *216 at its expense, and hence a right of action has arisen to recover that expense from the defendant.
In the course of the argument, the first question that was presented was, whether the obligation to keep the road at all times well paved and in good condition involved the obligation to construct the pavement where one did not originally exist. We are unable to see how that obigation can be fulfilled, of keeping the streets well paved, without constructing a pavement where one did not exist, and substantially that obligation was finally conceded in the courso of the argument.
It was also conceded — in fact it could not be avoided, because the language of the law is too explicit — that when a change of grade was ordered by the authorities of the District, it became the duty of the defendant company to conform its road to that grade, and also to reconstruct its pavement in conformity with it.
The first really serious controverted question is whether the authorities of the District, who at that time were represented by the Board of Public Works, had a right to prescribe the nature of the material of which this pavement should be composed; so that if a pavement had already been constructed before the time of the Board of Public Works, whether it could ordain that it should be removed and a pavement of a different character substituted.
Before these charters were passed the authority of the city of Washington was derived from its charters of 1812 and 1820, and under those charters, the power was vested in the corporate authoritities to cause the sidewalks and carriageways of the different streets to be paved upon the application of the abutting proprietors, and to charge the entire cost of the work to them. There was no restriction whatever; the corporate authorities were given control over the Avhole subject of pavements, including the grading, the material and everything else.
Excepting the entrance into the city, allowed bj its charter to the Baltimore & Ohio Railroad Company, the granting of these two charters to the city railways was the first *217 instance in the history of the city, probably, in which a private corporation was allowed to occupy for its business any part of the public highway. It is to us inconceivable that such corporations should be allowed an uncontrolled discretion as to material, or as to any other question attending the exercise of this power. Here was the general control of the subject vested in'the municipal corporation, and afterwards a private corporation was authorized to occupy a part of the public streets and the obligation imposed upon it of keeping that part well paved and in good condition. I say it is inconceivable that an uncontrolled discretion could have been intended to be vested in this private corporation. Naturally a collision would arise between this corporation — this private body — and the public authorities of the town upon this identical question, and the power must be lodged-somewhere of determining of what material a street pavement should be composed. Now we should expect, before examining the law, to find somewhere that the power of the private body was subjected to some public control, and looking at the charter, with this conviction or, as you may call it, this prepossession, we find that a clause of the first section provides: “ That the use and maintenance of said road shall be subject to the municipal regulations of the cities of Washington and Georgetown, respectively within their several corporate limits,” &c. . Perhaps the term use might be limited to the mere service of transporting passengers. But the maintenance of the road involves more; it involves the maintaining or keeping it, and applies as well to the construction of the road as to the maintenance of it. It seems to us that to subject the maintenance of the road to the municipal regulations subjects the whole question of construction to the general control of the public authorities. But, going further, we find in séction 5 that it is enacted: “That nothing in this act shall prevent * * * the cities of Washington and Georgetown from so altering or improving the streets and avenues,” and then it is declared to “be the duty of said company to change their said railroad so as to conform to such *218 altered grade and pavements.” The word “such,” of course, refers to an antecedent, and as the term “pavements” had not been previously used in the statute, it was evidently included in the general term “-improvements.” That is to say, that nothing in the act should prevent the Government or the cities from altering the grade or otherwise improving the streets and avenues by new pavements or what not, and that then it should be the duty of the company to change the roadways to conform to such grade and pavement. Now, taking this in connection with the previous section that imposed upon the defendant company the duty of keeping the tracks well paved, and the requirements of this section that whenever the grade should be changed they were required to conform their road to the new pavement, it seems to us that a fair construction is that it devolves upon the corporate authorities the duty to prescribe the manner in which this new pavement should be constructed by the company.
Then, in 1871, while this was the relation between these private corporations alnd the corporations of the two cities, came the act which abolished the late corporate authority and established a new Government for the District of Columbia by which, in the 37th section thereof, is enacted, “That the Board of Public Works shall have entire control of and make all regulations which they shall deem necessary for keeping in repair the streets, avenues,” &c. Could language be more comprehensive than this ? There might ‘be a question whether language more comprehensive than that contained in the charters of the city, could affect the chartered rights of the private corporations, already vested in them, but, as we have already expressed the opinion, that the corporate authorities of Washington and Georgetown had ample control of the subject, we think it only necessary for us to say that that control is vested in the new body, to wit, the Board of Public Works, and, therefore, we hold that that board had the right, in ordaining improvements and altering the grade, to prescribe the materials of which the entire new street should be constructed.
The main point relied upon in this case by the defence *219 in argument is, that the obligation of the companies was to construct these pavements only upon notice and demand that they should do so, and that they were not in default until that time, and that the District of Columbia authorities had no right to do that work and charge the cost to the defendant unless they had first been in default and failed to discharge their duty.
Now that will-depend somewhat also upon the construction of the charters of the two companies. Repeating the language of section 5:
“That nothing in this act shall prevent the Government at any time, at their option, from altering the grade or otherwise improving Pennsylvania avenue and such other avenues and streets as may be occupied by said roads, or the cities of Washington and Georgetown, from so altering or improving such streets and avenues as may be under their respective authority and control; and in such event it shall be the duty of said company to change their said railroad so as to conform to such altered grade and pavements.”
We see that it prescribes, not that it shall be their duty on demand and notice, but upon the happening af an event, and that event simply was the alteration of the street by the corporate authorities or by the United States.
Now it is true that when a person is bound by a contracq to do a certain thing upon the happening of an event, the knowledge of which is confined to the other party to the contract, he is not in default for not doing the thing until that knowledge is communicated to him. But in this case it would be preposterous to maintain that these companies did not have ample knowledge and notice, in that sense, of the proposed progressive improvements and changes. The law does not require that they shall execute the work upon being notified and demand being made upon them to do it, but in the event of a change being made by the United States or by the District authorities. All that is necessary for them to have is knowledge that the proposed improvement is begun or contemplated. That knowledge *220 may be derived, from any other source than the corporation. The first stroke of a pick in the streets would be sufficient to bring knowledge home to them. The first block of wood pavement, or the first wheelbarrow of dirt, placed along the street or thrown into it, would be sufficient to communicate a knowledge which would raise the obligation to conform to the proposed alteration.
Now, taking up first the case of the'Washington & Georgetown Eailroad Company, it'is very easy to find in the record — both in the correspondence and in the testimony— ample evidence of knowledge on, the part of the defendant that the work was going on. We find, for instance, page 59 of the record, under date of April 9, 1872, a notice from the vice president of the Board of Public Works to the president of the railroad company, that—
“The board' are now paving the carriageway and east side of Centre Market from canal bridge to Pennsylvania avenue with treated wood. It is noticed that you are paving between and in the railroad tracks with cobble stone. The board intend to have the whole carriageway 'paved alike and have so directed the contractor.”
Again, another letter under date of May 20, 1872:
“Mr. L. S. Filbert has been directed to remove the cobble stones from between the tracks of the railroad on New York avenue, between 14th and 15th streets, and at the intersection of New York avenue and 14th, and to pave the same with the Scharfe pavement, the same as the rest of the street,” &c.
So in the testimony on page 67:
“ The plaintiff then called as a witness the superintendent of the defendant, and by him gave evidence tending to prove that he was such superintendent during the years 1871, 1872, 1873 and 1874, and that when the pavements mentioned in the declaration were laid along the line of the railroad of the defendant, in the streets and avenues mentioned in the declaration, he knew of the laying of such pavements, and that the cars of the defendant, in, charge of its conductors and drivers, were running along and over the *221 said streets and avenues before and during the 'progress of said work, and that the grade of defendant’s railroad was, from time to time, by it changed and altered, as occasion required, during the progress of said work so as to conform to the grade established by the plaintiff, and the space between the exterior rails of the defendant’s railroad was, when the grade was changed, paved by it while the plaintiff was improving the streets and avenues mentioned in the declaration.”
Perhaps the most conclusive fact, however, upon this .question is that the railroad company, claiming that it had the right to lay this pavement and that the District had not the right to do it, filed its bill in this court to enjoin the District from laying the pavement between the exterior rails of its two tracks, and obtained an injunction against it, and then actually did the work between its rails, which the Board of Public Works required to be done. This action is brought against this company, not for that work, but for the work of laying the pavement between the exterior rails and a line two feet outside of them on each side of the double tracks, that parq. of the work which the statute required the company to do and which it did not perform, leaving that to be done by the District; the work between the rails was executed by the company itself.
Now, of course, this very proceeding to enjoin the District from executing the work from between the rails is proof demonstrative) that the company was' well advised of the work that the board had directed to be done. Knowing of that then, and actually doing the work within the exterior rails, the company simply failed to do the work required of them between the exterior rails and a line two feet outside. They never offered to do that, as the evidence shows, but acquiesced in the execution of that work by the District authorities.
Here then, is proof of an omission or failure on the part of the defendant to do the work, if an omission or default is necessary to give a right to the District, on default, to execute the work and charge the cost to the defendant. The *222 ground upon which that right is rested will be considered a little further on.
Another point made by the defence is, that the District authorities proceeded upon the theory that the railroad company had not the right to do this work between the rails, but that the District had the right, and it was their duty to execute the work itself. It is not claimed that the District authorities — the Board of Public Works' — claimed that they had a right or admitted that it was their duty to do this at the expense of the District ultimately, but simply that they had a right to do the work in the first instance, and at the expense of the defendant. That they expected the defendant to pay for it is very clear from the whole of the testimony.
It appears from an abstract from the minutes of the Board of Public Works, under date of August 21, 1812, that Mr. Riker, the president of the defendant company, was at one time personally present before- the board, and this took place:
“Mr. Riker et al., representing the W. & G. R. R. Co., called upon the board in relation to the track on Pennsylvania avenue east, and were informed that the board would not consent to have the track remain in the centre of the street as at present, but would insist upon its being removed to either side of the park from 1st to 8th street east. The board said that, so far as they were concerned, they were inclined to assess the property of the railroad company in the same manner as that of private individuals were, under the law, if it could be done.”
Immediately after the execution of the work, the Board of Public Works issued certificates of indebtedness against the property of the company. What they did claim was, that having this entire control over the streets, and having a responsibility for their condition, they must do the work in the first instance, but charge it to defendants.
But it is claimed ^hat this was a groundless pretence upon the part of the board, and’ that they had no right really to interfere with the companies in the execution of *223 the work, that they really took it out of their hands to do the work, which the statute required them to do, and prevented them from performing their contract; in other words, it is insisted that the defendants were not in default. Now, it is true if one party to a contract prevents the other party from performing his part of it, it does not lie in his mouth to claim a default. If the District authorities by setting up this claim prevented the defendant from doing the work, perhaps there might be some ground upon the part of the defence for resisting,.at least, the claim to the extent to which it is made by the District authorities. Did this claim upon the part of the District prevent either of the defendants from doing the work which the statute required them to execute. This is answered in the injunction proceedings to which I have already referred.
The Washington & Georgetown Railroad Company, denying the right of the District authorities to do the work, obtained an injunction against the Board of Public Works preventing them from doing the work between the exterior rails. Therefore it is plain’that the claim of the District authorities did not prevent the company from doing the work. The very contrary was established by the case in question. They did the work to the extent to which they asserted the right to do it, that they desired to do it, but not to the extent to which the law imposed the duty upon them to do it.
In the case of the Metropolitan Railroad Company, there was no effort made to interfere with the District authorities, but the latter were allowed tacitly to go on and do the whole of the work.
In the case of the Washington & Georgetown Railroad Company, the District was prevented from doing the work between the rails, but the company tacitly acquiesced in the execution of the work outside of the rails. It is therefore plain, as it seems to us, that this position taken by the District did not prevent the defendant from executing its duty, and therefore was not a discharge and did not prevent it from being in default.
*224 Another question is made as to the effect of the acts of Congress of June 19, 1878, and June 27, 1879, which are said to ratify the assessments made by the Board of Public Works. It is said that the Board of Public Works, in executing this work or a part of the work, undertook to issue certificates of indebtedness against the property of the railway company, and also that in some instances their course of proceeding was to charge the whole cost of the paving of the street, including the cost of paving which the defendant company had to do, against the adjoining lot holders. Now, in 1878, as we know, an act of Congress directed that the Commissioners of the District of Columbia should proceed to collect the assessments made in pursuance of the act of the legislative assembly of August 23, 1871. It is said that this act was a ratification of the assessments of the cost against the lot holders and that it was not afterwards in the power of the Board of Commissioners to change that assessment and recharge a portion of it to the railroad company ; that is, to re-charge to the railroad company so much of the cost of the pavement of the street as they ought to have done in the first instance. We do not understand that the law had any such operation as that at all.
It will be remembered that the power of assessing that was conferred upon the Board of Public Works, was “to assess in such manner, as shall be prescribed by law, upon the property adjoining and to be specially benefited by the improvements authorized by law, and made by them, a reasonable proportion of the cost of improvement, not exceeding one-third,” &c.
The difficulty with the assessments made by the Board of Public Works was that the legislative assembly of the District never passed any law providing the manner of assessment, but the Board of Public Works proceeded to assess one-third of -all improvements upon adjoining lots by the front foot, not by the area, not by valuation, but by the front foot without reference to the depth of the lot or value. Of course, as there was no law to authorize it the whole system uwas simply illegal, and the object of this act of *225 Congress evidently was to legalize that mode of assessment, but not to legalize the errors or excessive charges that were committed in the process of making the assessment, because the law itself provides that upon complaint by any party of errors in the assessment or of excessive charges made by the Board of Public Works, it should be the duty of the Commissioners to revise the assessments and correct them. The act says :
“ That the Commissioners of the District of Columbia be, and are hereby directed to enforce the collection, according to existing laws, of all assessments of special improvements prepared under an act of the Legislative Assembly of August tenth, eighteen hundred and seventy-one, as charges upon the property benefited by the improvements in re•spect to which said assessments weré made; provided, that upon complaint being made to the Commissioners, within thirty days from the passage of this act, or erroneous or excessive charges in respect to any of said assessments which remain unpaid, said Commissioners ar-e hereby authorized to revise such assessments so complained of and to correct' the same.”
So that if an error occurred in the making of an assessment, by and through which a charge proper to be made against one man was made against another, that error should be corrected under the terms of this act. That is one kind of error that was uniformly corrected in the revision of assessments. Now it appears that there was an error in charging against the abutting lot owners the cost of paving this space, which was exclusively devolved by the law upon the railroad company; and that was one of the very errors that it was the duty of the commissioners to correct under the act of June 19, 1818. Another question was made growing out of the mistaken construction of their powers by the Board of Public Works in the early part of the improvements. They conceived, at first, that, when they laid a pavement, which was chargeable to the railroad company, they could issue a certificate of indebtedness, or certificate of stock, as it is sometimes called, against the property of *226 the railroad company for the cost, and they might sell these assessments or certificates in market. Accordingly they did issue certificates and obtain money upon them from the First National Bank of New York.
Now, it is said that they are claiming in this suit to recover that identical money back again that they had already received, and that they ought not to be allowed to do it. At first glance this defence seems to be a very plausible- one; yet, after all, it amounts to this, that though the defendant has not paid the debt that the law imposed upon it, yet it ought to be discharged entirely because the District has endeavored to realize money on that obligation from another quarter. The case might be likened to 'an action on a promissory note by a party, other than the maker, who takes up the note and holds it; the note is not extinguished as against the maker, because one goes and pays it and holds it. It depends entirely upon the intent with which it is done; whether the debt is paid and extinguished as the debt of the maker or not. He may go and voluntarily pay it, but if he does pay it with a view of holding it for himself, the maker’s obligation is not discharged and the new holder has a right to sue him. That was the case decided by the Supreme Court of the United States in the case of the Freedmens’ Saving and Trust Company vs. Dodge, 93 U. S., 379: Now, when these certificates were assigned to the First National Bank, it was not the intention of either of these parties that the obligation of the company to pay the money should be extinguished. Not at all. The District assigned that obligation to the First National Bank to be held by the latter on its own account, and clearly it did not extinguish the indebtedness of the defendant.
It is now agreed upon all hands, however, that the Board of Public Works were in error in reference to their powers, and that they had no right to issue any such certificate as was issued by them against the property of the defendant; that it gave nothing to the First National Bank; that it did not give to the bank a right of action against the de *227 fendant, nor did the certificate constitute a charge upon the property of the defendant; that the District got the money of the First National Bank for nothing; that nothing was acquired by the First National Bank, and that, therefore, nothing was parted with by the District. Now, whether the First National Bank can recover that money from the District, as for money paid under a mistake or paid for a consideration that has failed, is a question that does not concern this defendant Certainly the moral obligation exists on the part of the District to return the money to the bank, but the indebtedness of the defendant remains undischarged, and the only representative of that indebtedness is the District of Columbia. The First National Bank does not own the debt; it is still held in legal contemplation by the District, and the fact of issuing these certificates does not interfere with the right of the District to collect its debt.
It may, then, be well to state the general principles upon which this action is sustained. It is substantially an action to recover money paid, laid out and . expended, by the District for the use of the defendant at its special instance and request.
The general rule, as we know, is that a past and executed consideration is not sufficient to sustain even an express promise. Therefore if I pay money for another man, without any request from him, even his promise to pay has been held insufficient for this past executed consideration. But wherever the money is paid on the request of the party benefited, the right to recover does exist. That request may he either expressed or implied. The general rule is stated in Wait’s Actions and Defences, cited on the part of the defendant in argument. At page 449 of volume 4 of that work it is said:
“An action of assumpsit for money paid by one person for another can only be maintained when it was paid in pursuance of a request-from such person, express or implied, so that either an expressed or implied promise to repay the same can be predicated thereon.”
*228 Again, op. page 453:
“In order to entitle a person to recover for money paid for another, a request, express or implied, must be established, or an express promise to repay it, and it may be said that, in all cases where there is a legal obligation on the part of the person paying to pay the money, the primary obligation resting upon the person for whose benefit it was paid, the law implies a request and a consequent promise that will uphold an action to recover it back.”
Now what is the relation between the District and the railroad company? In the case of Barnes vs. The District of Columbia, it will be remembered that the Baltimore & Potomac Railroad Company, in crossing certain streets within the limits of the city, left a dangerous excavation, down which the plaintiff fell, and he brought an action for the injuries he had sustained. The main question there was whether the acts or neglects of the Board of Public Works were chargeable to the District, but the important principle established in that case, as applicable to this case, was that the District of Columbia is responsible for the condition of its streets, and is bound to see that they are kept in good condition, and where a railroad company is authorized to construct its road in a street or avenue, the District is the company’s surety for the safe condition of its streets, and cannot be absolved from obligation.
The District of Columbia — the Board of Public Works at that time — was bound for the proper paving of the streets, bound in the relation of a surety to the railroad company, on whom primarily the obligation rested. Now, in the cases which are put in the books, it is not necessary that any notice be given, or demand first made, upon the principal before the surety’s right accrues to pay the debt, and then to recover the money paid on account of the principal. The very fact that the obligation has not been discharged by the principal is, in itself, sufficient to entitle the surety to pay the debt, and then reclaim the money from his principal. It is upon this ground, we think, that this defendant not having done or offered to dó the work, and the District being *229 responsible for tbe condition of its streets, tbe District should proceed at once to do the work as surety, and then claim the money from the defendant, who is primarily responsible for the condition of the street, upon the implied promise to refund the money.
We recognize the rule which was recognized by the court at Special Term, that if the company chose to do the work they might do it, and they might have enjoined the District authorities from interfering with them, but if they fail to offer to do it, fail to notify the District authorities, then there was that condition of things which would authorize the District to do the work at its own immediate expense, but at the ultimate cost of the defendant, and to reclaim the money from the latter.
There is is still another ground to be noticed in this connection. The second prayer granted by the court below was:
“ The jury is instructed that, in determining whether the defendant company had notice or knowledge that themunicipal authorities had directed and ordered that new pavements should be.laid on the said streets and avenues,- and had entered upon the performance of the said work, they are authorized to consider the testimony, to the effect that the defendant changed the grades of its track so as to conform to the grades of the new pavement; that its cars were running along the said streets ■ and avenues while the work was progressing; and that the defendant obtained an injunction to prevent the paving of the spaces between its tracks, while the rest of the streets and avenues were being paved, with the other testimony in the case.”
Now the facts developed in this regard were, that while the District was asserting its right and duty in paving the streets in the first instance at the cost of the defendant, the defendant came into court and objected to the District’s paving between its rails, but made no objection to its paving on the outside of the rails. In other words, it tacitly consented to the right claimed by the District to pave this part ■of the street at the expense of the company, and this would *230 bring the case within the rule elsewhere laid down in Wait, p. 453, as follows:
“Thus, where one pays money to satisfy a deb-t of a person, at his request, from such request the law would imply a promise to repay it.” Cook vs. Linn, 19 N. J. Law, 11; Mills vs. Johnston, 23 Tex., 308.
“ And this would be the case where there i's no express request, but a tacit assent to such payment, as where A pays money for B when B is present, to which he does not object, unless the circumstances are such as to indicate that it was gratuitous, the law from such tacit assent will treat the money as having been paid at B’s request.” Packard vs. Lienoir, 12 Moss, 11.
It has been claimed that this was money paid under a mistake of law, and the general rule has been insisted upon that money paid under a mistake of law cannot be recovered back. According to the view we have taken there was no mistake of law, as the District had a right to do the work and charge it to the defendant. The general rule as to money paid under a mistake of law has no application to this case. That rule is, that if I pay money under the mistaken impression that it is my duty to pay it — that it is my debt — and I discover afterwards that I was not bound to do it, I could not recover the amount so paid from the party to whom paid. Accordingly, if the District authorities had paid this money to a contractor for work that the District was not bound to do, it could not recover the money from the contractor. But if the District could not recover it from the defendant in this case, it would not be upon the ground that it was paid under a mistake of law, but because it was paid by the District without any previous request of the defendant, express or implied. But, independently of that, it is doubtful how far such a rule could have application to public officers. If a public officer undertakes to pay the public money under the mistaken impression that it was his duty to do it, it would not relieve the person really owing it from the obligation to pay it.
These are the general principles that we understand gov *231 ern this case. The plaintiff ashed ten different instructions and the defendant asked twenty-one; there were thirty-one instructions asked for altogether. These were all rejected by the court, save two granted at the instance of the plaintiff, and the court gave some of its own motion. We do not propose to examine these instructions in detail. It is sufficient to say that we have looked over them, and we have come to the conclusion that the judge’s rulings were in conformity with the law, as we have defined it, and ths judgment is therefore affirmed.
In the case of the District against the Metropolitan Railroad Company precisely the same questions arose, with an additional one.
In the case of the Washington & Georgetown Company, the District only had occasion to pave the spaces outside of the exterior rails two feet, but in the case of the Metropolitan Railroad Company, the District did the whole work between the rails and two feet outside of the exterior rails, and seeks therefore-to recover the whole of that.
The evidence as to the work and the knowledge upon the part of the defendant is substantially the same in both cases. The correspondence which is in the record shows that the officers of the company were fully advised of the progress of the work and it is not necessary to go over that. I will simply refer to one item on page 82 of the record:
“ That at the commencement of the work on the line of the defendant’s railroad, then constructed and laid, the right was claimed by the defendant when the pavement in the spaces aforesaid laid by the defendant, had been taken up on account of a change in grade to relay the said pavement, which right was denied and refused by the said Board; and that the said Board in awarding the contracts for all pavements to be laid on the line of the defendant’s railroad declared and defined its policy and determination that it would, itself, lay the said pavements over the entire roadway, from curb to curb, and with such material as the said Board had selected, and that neither in the laying of said *232 pavement, nor in the selection of the material to be used, did the defendant take part.
“ The defendant further gave evidence tending to prove that it never received any request or demand on behalf of the plaintiff, or the said Board, lior had any opportunity afforded to do any part of the work mentioned in the declaration, nor did the said defendant offer to do any of the work sued for.”
The company were perfectly well apprised of the fact that the Board claimed the right to do this work and denied their right to do it. The defendant asserted its right to do it provisionally, but not in any legal proceeding that they might have taken. They said that they were deprived of the opportunity to do it, not that they offered to do it. They appear to have stood still and quietly acquiesced in the doing of the work by the District. The same principles of law apply to this case as the other. There was one additional feature, however, in this case.
A part of the road of this company was authorized to be run through certain streets where they had not commenced to lay their tracks at the time the board proceeded to lay the pavements that they had selected for the different streets. The president of- the company entered into correspondence with the Board of Public Works, the most important part of which is found on page *78 of the record where it appears that Mr. Thompson wrote to the Board of Public Works in these words:
“Tour hoard having recently ordered the paving of certain streete through which Congress had given this company permission to lay rails whereon to run street cars, we would respectfully ask the privilege to lay down the sleepers and cross-ties as the paving progresses, thereby preserving the streets and avenues from being cut up at a future day in the execution of this work. It is the intention of this company to extend the Metropolitan railroad westward from its present terminus to Georgetown and eastward to Union-town, and also lay tracks on Ninth street from Pennsylvania avenue to the Boundary, and in Four-and-a-half street *233 from the City Hall to the Arsenal gate, as soon as the property holders along these lines subscribe to additional stock, which, it is hoped, will be done shortly. The company are willing, with the permission of the board, to go on at once and lay the timbers for these lines, fully preparing them for the rails to he put in at some future time. To keep a well laid pavement in good order it is desirable to avoid all excavation, particularly in the center of the street. This consideration doubtless influenced your board in the wise precaution of ordering all water, gas and service pipes to be laid prior to the paving. The necessity is more apparent, where railroad privileges have been granted, to have the timbers laid as the paving progresses which will not only be a benefit to the city but add to the comfort of those residing upon or passing over the street. We are willing to anticipate the putting down of the sleepers and cross-ties of our contemplated extensions, provided the paving be done by your own contractor without charge against us, and should be pleased if the suggestion herein submitted.should meet the favor of your board.”
The District went on and laid the pavements of these streets, and at the same time the company laid its stringers and cross-ties and prepared them for adaptation to the uses of the road at some future time; and it is now claimed that they ought not to be charged for that part of the pavement laid between the rails of this road and the two feet outside. Whenever the company undertook to lay down its railroad where there was no pavement, it is very-clear that the obligation to keep the streets well paved involved the obligation to construct pavements anew. If the charter had authorized it to lay its road on a street already paved, and that pavement could be utilized so that the road could be laid down without destroying it, I suppose the obligation of the company would have been satisfied if it kept the existing pavement in good condition, and it would not be bound to pay the District for a pavement constructed before the road was even chartered. This case covers these two supposed cases. It is a case where the street was not *234 paved at all when, the charter was given, but where the company had elected before the pavement was laid down to extend its road into the street. •
Now there was offered in evidence an act of Congress under date of March 3, 1869, under which the company claimed that it had five years from that date within which to complete its road. However that may be, the company, as we have seen, addressed a letter to the Board of Public Works, which has already been referred to, by which they proposed to have the same benefit of the pavement that the board should lay down as if they had constructed their road simultaneously with the pavement, but they claimed at the same time not to be charged — not to be burdened with the same charge that the law would impose upon them under such circumstances. For that purpose they proposed to divide up the process of constructing their road so that a part of it would post date the completion of the pavement and then claim that they did not occupy the street with their road until after the pavement had been made.
Now, it seems to us that, as this company had elected to construct their road in the street, and have the use of the pavement which the board was laying down, and complete their road after the pavement was completed, that this process of constructing their road was to be treated as one thing; that they could not divide it up so as to get the benefit of the pavement that the board was laying, and yet avoid the charge that the law imposed upon them when they constructed their road simultaneously with the work done by the board, and that when they did use and occupy the street for the purpose of their railroad, they should reimburse the board for the paving that was done for their benefit; that when Mr. Thompson said that they were willing to lay their stringers and cross-ties, “provided the paving be done without charge to us,” he should have said, “provided, that when the road is completed, and when we occupy the street hereafter, we will reimburse you for the work you are now doing.”
There is, in our judgment, no error in the case, and I will *235 make the same remark about this case as I did about the other, that there is a great number of instructions which are substantially the same in the two cases. We think the judgment in this case should also be affirmed.