# M. LOWENSTEIN & SONS, Inc., v. BRITISH-AMERICAN MFG. CO. et al.

(District Court, D. Connecticut. July 8, 1924.)

No. 1666.

1. **Corporations ⬡477(5)—Estoppel to deny regularity of proceedings author-izing mortgage.**

A corporation, having authority to execute a mortgage to secure bor-rowed money, *held* estopped to deny the regularity of the proceedings authorizing the mortgage as against a lender in good faith in reliance on the certificate of the secretary showing that the proceedings were regular.

2. **Usury ⬡53—Contract to render services to borrower for compensation held device to cover usury.**

Concurrent transactions by which complainant corporation made a loan to defendant, payable in installments over a stated period, and a firm, the members of which were the controlling stockholders of complainant, contracted to render such service to defendant as it deemed advisable during the same period, for which it was to receive a salary, payable periodically, exactly equal to 2 per cent. of the amount then due on the loan, and also a commission on the gross sales of defendant, *held* in effect a single transaction, and a device to cover usurious interest on the loan; it not appearing that service of any value was rendered by the firm under the agreement.

3. **Corporations ⬡1—Distinction between corporate entity and persons in con-trol disregarded, where used for unlawful purpose.**

While in theory a corporation is a distinct entity from the persons controlling it, this fiction will be disregarded where a recognition of it would permit the perpetration of a fraud or the accomplishment of an unlawful object.

4. **Usury ⬡41—Offense against statute consists in making of the usurious con-tract.**

The offense against a usury statute consists in the making of the agreement by which it is contemplated that a sum in excess of lawful interest will be obtained, even though its realization is contingent, if the debt, with legal interest, is enforceable in any event.

5. **Usury ⬡34—Loan held usurious under Connecticut statute.**

A loan secured by mortgage on both real and personal property, taken in connection with a collateral agreement, which was a part of the same transaction, which bound the borrower to pay a sum in excess of the loan and lawful interest, *held* not within the exception of Gen. St. Conn. 1918, § 4803, as amended by Laws 1921, c. 118, that the preceding sec-tions relating to usury shall not affect "any bona fide mortgage on real property exceeding the sum of $500," but usurious and unenforceable, under section 4802, providing that no action shall be brought on any loan prohibited by the preceding sections, "or upon any cause arising from the negotiation of such loan."

6. **Usury ⬡83—Right of corporation to plead usury held not affected by stat-ute of state of incorporation.**

Rev. Code Del. § 2621, as amended by Acts 1915, c. 213, and providing, inter alia, that "no corporation shall hereafter interpose the defense of usury in any action," applies to all corporations, domestic or foreign, when sued in the courts of that state, but does not become a part of the charter of a corporation organized under the laws of that state, so as to affect its rights when sued in other jurisdictions.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Contracts ⬅︎101(1)—Law of forum governs where contract was made partly in that state and partly in another.**

Where a loan was made by a party in New York to a party in Connecticut, the transaction being carried out partly in one state and partly in the other, the law of Connecticut, where suit was brought on the contract, governs.

In Equity. Suit by M. Lowenstein & Sons, Inc., against the British-American Manufacturing Company and others. Decree for defendants.

Walter C. Noyes, Emanuel J. Myers, and Samuel J. Goldsmith, all of New York City, for plaintiffs.

Henry M. Earle, of New York City, Carl Foster, of Bridgeport, Conn., and Max Spelke, of Stamford, Conn., for defendants.

THOMAS, District Judge. This is a bill in equity, brought by M. Lowenstein & Sons, Inc., a New York corporation, against the British-American Manufacturing Company, a corporation organized under the laws of Delaware, and the receiver of that corporation and others, to foreclose a mortgage given by the British-American Manufacturing Company to the plaintiffs as security for a loan of $125,000, made April 2, 1920. The defenses pleaded by the receiver are: (1) That the mortgage was not authorized; and (2) that it was usurious and within the Connecticut statutes providing against the bringing of an action to recover on an usurious loan.

[1] The plaintiff denies that authority to execute the mortgage was lacking, and contends that, even though this be so, the defendants are estopped from setting it up. In support of this claim that the mortgage was unauthorized testimony was introduced by the receiver to the effect that one of the directors of the company was not present at the meeting authorizing the mortgage and a certain other agreement, which, it is claimed, was part of the mortgage transaction, and had no knowledge of the execution of the mortgage. The testimony on this point was conflicting, but, however that fact may be, it does not appear that the plaintiff had any knowledge of the absence of that director. The secretary of the company signed certificates stating that a resolution had been passed authorizing the execution of the mortgage, and also that a resolution had been passed authorizing the execution of the other agreement in question, which will be considered further in another connection. In Merchants' Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008, Mr. Justice Swayne, speaking for the court, on page 644, said:

"Where a party deals with a corporation in good faith, the transaction is not ultra vires, and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists. If the contract can be valid under any circumstances, an innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them."

In Royal British Bank v. Turquand (1856) 6 El. & Bl. 327, it was held that, where the directors were authorized to borrow, if so au-

thorized by a vote of the stockholders, and the directors borrowed without such vote having actually been taken, which fact is unknown to the lender, the corporation is bound. The conclusions reached in the Merchants' Bank and Royal British Bank Cases, supra, were approved and quoted by the Supreme Court in Louisville, etc., Ry. Co. v. Louisville Banking Co., 174 U. S. 552, on pages 574 and 575, 19 Sup. Ct. 817, 43 L. Ed. 1081. In Morawetz on Private Corporations the rule is stated in section 610 in the following way:

"However, a party dealing with an agent of a corporation has usually no means of ascertaining whether formalities prescribed in the management of the internal affairs of the company have been complied with, and matters of this kind are peculiarly within the knowledge of the company's agents. It has therefore been held that, if a person deals with an agent of a corporation within the scope of his apparent authority, and without notice of the nonperformance of any formality prescribed by the charter or by-laws as a condition precedent to the agent's authority to act, he will be entitled to assume that the formality has been complied with, and the corporation will be estopped from showing that the agent had no authority to bind it, by reason of a failure to comply with the prescribed condition."

In Galveston Railroad v. Cowdrey, 11 Wall. 459, 20 L. Ed. 199, there was an irregularity consisting of the holding of the meeting authorizing the particular transaction at a place different from that prescribed by the charter and by-laws of the corporation, which irregularity was unknown to the outsider, and it was held that the corporation was bound. In the light of these authorities, I must conclude that, inasmuch as the secretary of the corporation certified that all acts necessary for the authorization of this transaction had taken place, and that since it does not appear that M. Lowenstein & Sons, Inc., had any reason to doubt the authenticity of this, the corporation is bound, unless the defense of usury can be made out.

On the defense of usury there are, in effect, two questions presented for decision: First, assuming that the case is governed by the law of Connecticut, was the transaction in violation of the Connecticut statutes against usury, and is the plaintiff therefore barred from bringing this action? Second, are the Connecticut statutes to be considered in determining the result of this action, or is this suit governed by the laws of some other state, viz. Delaware or New York?

The Connecticut statutes material to this issue are as follows:

General Statutes of Connecticut, Revision of 1918:

"Sec. 4798. *Loans at Greater Rate than Twelve Per Centum Prohibited.* No person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 3011, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive, therefor, interest at a rate greater than twelve per centum per annum.

"Sec. 4799. *Notes Not to be Accepted for Greater Amounts than Loaned.* No person and no firm or corporation or agent thereof, shall, with intent to evade the provisions of section 4798, accept a note or notes for a greater amount than that actually loaned."

"Sec. 4801. *Penalty.* Any person who, individually, or as a member of any firm, or as an officer of any corporation, or as an agent of any firm or corporation, shall violate any of the provisions of sections 4798, 4799 and 4800, shall be imprisoned for not more than six months or fined not more than one thousand dollars or both.

"Sec. 4802. *Actions Not to be Brought on Prohibited Loans.* No action shall be brought to recover principal or interest, or any part thereof, on any loan prohibited by sections 4798, 4799 and 4800, or upon any cause arising from the negotiation of such loan.

"Sec. 4803. *Loans to Which the Preceding Sections do Not Apply.* The provisions of sections 4798, 4799 and 4800 shall not affect any loan made prior to September 12, 1911, nor any loan made by any national bank or any bank or trust company duly incorporated under the laws of this state, nor any bona fide mortgage of real property exceeding the sum of five hundred dollars."

Section 4803 was amended by chapter 118 of the Laws of 1921 to read as follows:

"The provisions of sections 4798, 4799 and 4800 of the General Statutes shall not affect any loan made prior to September 12, 1911, nor any loan made by any national bank or any bank or trust company duly incorporated under the laws of this state *or any bona fide mortgage of real property exceeding the sum of five hundred dollars.* No provision of this act shall prevent any such bank or trust company from recovering by an action at law the amount of the principal and the interest stipulated or interest at the legal rate, if interest is not stipulated, in any negotiable instrument which it shall have acquired for value and in good faith without notice of illegality in the consideration."

[2] The facts of the case, in so far as I find them to be pertinent to the first question, are these:

In the early part of 1920, the British-American Manufacturing Company, the mill of which was located in Springdale, Fairfield county, Conn., was in dire need of capital to enable it to continue in business. Some of its creditors were pressing it for money, and the president of the company, Mr. E. A. Brinckerhoff, had made unsuccessful attempts to obtain a loan. In February of that year Mr. Brinckerhoff met Leon Lowenstein at the office of the latter in New York City. Mr. Lowenstein was an officer of M. Lowenstein & Sons, Inc., and with his brother, Abraham Lowenstein, conducted the partnership business of Lowenstein Bros. Abraham Lowenstein was also connected with M. Lowenstein & Sons, Inc., and with his brother Leon controlled that corporation. Negotiations were begun respecting a loan from M. Lowenstein & Sons, Inc., to the British-American Manufacturing Company, and during March, 1920, an advancement of $70,000, secured by demand notes, was made. On April 1, 1920, a mortgage on the plant and machinery of the British-American Manufacturing Company to secure the re-payment of $125,000 was executed and delivered by the British-American Manufacturing Company to M. Lowenstein & Sons, Inc. On that day Mr. Josiah Canter, an attorney at law, connected with the firm of Myers & Goldsmith, of New York City, counselors for M. Lowenstein & Sons, Inc., was prepared to deliver the final check of $55,000 to the officers of the British-American Manufacturing Company at the office of Judge James E. Brinckerhoff, in Stamford, Conn. Judge Brinckerhoff, who was in no way related to or connected with the Brinckerhoffs of the British-American Manufacturing Company, was at that time examiner of titles for the Fidelity Title & Trust Company, of Stamford, which subsequently issued a title bond on the mortgage. At that time it was found necessary to make a further examination of the title, so that the $55,000 check was not actually delivered un-

til the next day, April 2, 1920, in New York City. The promissory notes, six in number, aggregating $125,000, bearing interest at 6 per centum per annum, were delivered to M. Lowenstein & Sons, Inc., in New York City on April 1st. These notes, of varying amounts, were payable annually at a New York Bank, the last one to mature April 1, 1926.

At the time the notes were delivered, an agreement was entered into by the terms of which the British-American Manufacturing Company was to employ the firm of Lowenstein Bros. as factors for a period of six years, the employment to terminate on the same day that the last note from the British-American Manufacturing Company to M. Lowenstein & Sons, Inc., was to mature. By this agreement, which was never recorded, the partnership firm of Lowenstein Bros. was to receive a salary totaling $7,400 and a commission of 5 per cent. on the gross revenue of the British-American Manufacturing Company. The salary was to be paid in installments, the amount diminishing as the life of the agreement continued. Thus the first installment, payable October 1, 1920, was to be $1,250, the last installment, payable April 1, 1926, was to be $100. The agreement in full is as follows:.

"Agreement made and entered into this 2d day of April, 1920, by and between British-American Manufacturing Company, a corporation organized under the laws of the state of Delaware, party of the first part, and hereinafter called 'the company,' and Lowenstein Bros., composed of Abraham L. Lowenstein and Leon Lowenstein, parties of the second part, and hereinafter called 'the firm,' witnesseth:

"For and in consideration of the sum of one dollar ($1), each to the other in hand paid, the receipt whereof is hereby acknowledged, and of the promises and agreements herein contained, it is mutually understood and agreed by and between the parties herein:

"(1) The firm agrees to give and extend to the company such service, counsel, advice, and pecuniary assistance as in its discretion it may deem advisable, for the term of six years from the first day of April, 1920, and ending and expiring on the 31st day of March, 1926, but the firm shall not be held liable, bound, or obligated to do or perform any act during the said period for the company, unless in the exercise of its discretion and judgment it may deem such act to be fit, prudent, and proper so to do, and in consideration thereof the company agrees to pay to the firm a compensation or commission of 5 per cent. on the net sales of the entire products of the company's mill, which shall be ascertained by taking the invoice price of said sales, and deducting therefrom all trade discounts extended, and crediting against the same all returns allowed, deductions, offsets, allowances, cancellations of merchandise by the customers or parties to whom the said goods may or shall be sold or consigned. The company agrees to furnish and render to the firm on the 15th day of each and every month during the said period complete and accurate statements showing the net sales for the preceding month, and disclosing and including all trade discounts, claims, deductions, effects, allowances, returns, and cancellations, and said statement shall be accompanied by the company's check for the said commissions and compensation of 5 per cent. aforesaid.

"(2) The company further agrees to pay to the firm, in addition to said commission, by way of additional and further compensation, the following several sums of money at the times and in the amounts particularly provided: Twelve hundred and fifty dollars ($1,250) on the 1st day of October, 1920; twelve hundred and fifty dollars ($1,250) on the 1st day of April, 1921; nine hundred and fifty dollars ($950) on the 1st day of October, 1921; nine hundred and fifty dollars ($950) on the 1st day of April, 1922; seven hundred dollars ($700) on the 1st day of October, 1922; seven hundred dollars ($700) on the 1st day of April, 1923; four hundred and fifty dollars ($450) on the

1st day of October, 1923; four hundred and fifty dollars ($450) on the 1st day of April, 1924; two hundred and fifty dollars ($250) on the 1st day of October, 1924; two hundred and fifty dollars ($250) on the 1st day of April, 1925; one hundred dollars ($100) on the 1st day of October, 1925; one hundred dollars ($100) on the 1st day of April, 1926.

"In witness whereof the parties hereto have hereunto caused these presents to be signed and its corporate seals to be affixed, the day and year first above written.

"British-American Manufacturing Company,
"By E. A. Brinckerhoff, President."

The amount of the salary specified in the agreement is exactly equal to interest on the loan of $125,000 at the rate of 2 per cent. per annum, and it is the contention of the defendant receiver that it was intended that this sum was in fact to be additional interest for the $125,000 loan, as was also the commission of 5 per cent. on the gross revenue of the British-American Manufacturing Company. Between the date of this agreement, which was also the date of the execution of the mortgage, and December, 1920, when proceedings were instituted against the British-American Manufacturing Company which resulted in the appointment of receivers for that corporation, M. Lowenstein & Sons, Inc., received from the British-American Manufacturing Company $6,982.63, and Lowenstein Bros. received $16,825.59, the total being $23,808.22. Of the amount paid to Lowenstein Bros., $1,250 was the first installment of the salary as provided in the agreement of April 2, 1920. The balance was commissions at the rate of 5 per cent. on the net sales, which, from the terms of the agreement, was equivalent to 5 per cent. on the gross revenue of the British-American Manufacturing Company. Thus within a period of less than nine months M. Lowenstein & Sons, Inc., and Lowenstein Bros. together received a sum approximately 19 per cent. of the principal loaned. If regarded as interest, this would make the rate about 25 per cent. per annum for the time elapsed.

The plaintiff claims that the transaction between Lowenstein Bros. and the British-American Manufacturing Company was entirely independent of the loan of $125,000 and the mortgage of the plant and machinery. This agreement, they say, was for services as factors, and negotiations for it arose subsequent to the negotiations resulting in the loan and mortgage. I am of the opinion, however, that this contention is not supported by the evidence. The testimony of the plaintiff's witnesses as to the time when discussion of the employment of the Lowenstein Bros. began is contradictory. At a previous hearing some of them testified that this matter arose at the inception of the negotiations for the loan, and that both together constituted a single transaction. At the trial of this case they denied that this is the correct view. Since the testimony as to when this matter first came up is so uncertain, it becomes necessary to consider the attendant circumstances to arrive at a decision as to whether that which on its face seems to have been two transactions was really one, and whether the salary and commissions payable to Lowenstein Bros. for "services" were really extra interest for the use of the money loaned by M. Lowenstein & Sons, Inc. In this connection it must be noted that M. Lowenstein & Sons, Inc., were not realtors, and were not in the business of loaning

money on real estate. They were commission merchants, buying and selling, among other things, goods like the product of the British-American mill, the output of which the Lowensteins desired to control. It seems to be the well-recognized practice of those seeking to evade usury laws to attempt to conceal their purpose of obtaining the interest in excess of the legal rate under the guise of receiving payment for services. The Legislature of Connecticut appears to have been cognizant of this when it enacted chapter 219 of the Laws of 1919, section 17 of which is as follows:

"No person, partnership or corporation, except as authorized by the provisions of this act, shall, directly or indirectly, charge, contract for or receive any interest or consideration greater than twelve per centum per annum upon the loan, use or forbearance of money, goods or things in action, or upon the loan, use or sale of credit, of the amount or value of three hundred dollars or less. The foregoing prohibition shall apply to any person who, as security for any such loan, use or forbearance of money, goods or things in action or for any such loan, use or sale of credit, makes a pretended purchase of property from any person and permits the owner or pledger to retain the possession thereof, *or who, by any device or pretense of charging for his services, or otherwise*, seeks to obtain a greater compensation than is authorized by the provisions of this act. No loan for which a greater rate of interest or charge than is allowed by the provisions of this act has been contracted for or received, wherever made, shall be enforced in this state, and any person in any wise participating therein in this state shall be subject to the provisions of this act."

The defendant, emphasizing the argument that the Connecticut statute applied to loans "wherever made," apparently had this statute in mind. But this statute is not applicable to the case at bar, since it covers loans of less than $300 and is entitled an act respecting interest on small loans, or words to that effect. In the present case, the same persons conducted the negotiations for the loan by M. Lowenstein & Sons, Inc., and the negotiations for the employment of Lowenstein Bros. Both transactions were closed at the same time and were to run for a concurrent period of six years. The amount of salary specified diminished as the amount outstanding on the loan diminished, and equaled exactly 2 per cent. of the principal over the six-year period. This strikes me as being something more than a mere coincidence.

By the terms of the agreement between Lowenstein Bros. and the British-American Manufacturing Company, the former were to render only such services as they should deem fit and proper, nor do I find that services of any real value were in fact rendered by Lowenstein Bros. It does not appear that any of the sales of goods upon which Lowenstein Bros. received a commission of 5 per cent. were made through their aid. In Douglass v. Boulevard Co., 91 Conn. 601, 100 Atl. 1067, there was a somewhat similar situation. In that case the plaintiff, from time to time, advanced money to the defendants for the purchase of automobiles. In addition to interest at 6 per cent. upon the sums advanced, the defendants were to pay the plaintiff a commission of $50 upon every car sold. The syllabus reads, in part, as follows:

"The plaintiff insisted that this commission was payable for his services in giving sound business advice and for recommending to his friends and acquaintances the purchase of the defendants' cars and trucks; while the defendants contended that it was a mere device or cover for a usurious loan.

Held that under these circumstances the reasonable worth or value of the plaintiff's services as compared with the amount which the defendants agreed to pay therefor, became a material and important matter for the consideration of the jury, and that the omission of the trial court in its charge to call the jury's attention to the significance of this relation or comparison, coupled with a remark which practically removed that subject from their consideration as bearing upon the question of intent, constituted reversible error."

Speaking for the court, Mr. Justice Shumway, on page 604 (100 Atl. 1068) said:

"All statutes against usury, as interpreted by the courts, have been held to prohibit contracts made with an intent to evade the statute, whether or not such statutes have provisions the same as the one now in force in this state. Whether such an intention is present in any contract is always a question of fact for the jury. No device can be invented, and no disguise can be put on, which will make a contract valid, if behind or underneath an intent to evade the statute is found. It, then, must follow, that every circumstance surrounding or connected with the transaction is material, if in any manner it will reveal the intention of the parties. Therefore where a lender of money contracts with the borrower that the lender shall be paid for services, which contract is a part of the contract of loan, whether of money or credit, the reasonable value of the services becomes material and important upon the question of intent. If the services are of little or no value and the amount agreed to be paid for them is considerable, from our knowledge of the usual conduct of parties in business transactions the inference to be drawn therefrom is that the compensation was to be for the use of money rather than for services. Even a broker, who may properly charge a commission for the sale of his principal's property in addition to legal interest upon sums advanced upon the property, cannot make a valid agreement to charge unreasonable and exorbitant commissions, if the purpose be to evade the statute against usury; for the law will tear off the disguise and treat the contract as usurious. Mills v. Johnston, 23 Tex. 308."

In Mills v. Johnston, 23 Tex. 309, the court said:

"The question whether or not a commission merchant is entitled to charge a certain commission in a given case is answered by ascertaining whether or not the commission charged is a fair and reasonable compensation for a service rendered. If it be fair and reasonable, then it may be charged and recovered by law. If it be unreasonable or exorbitant, then, in the absence of such a special contract as would preclude inquiry into its fairness and reasonableness, it cannot be recovered by law. Again, if the name of commission be used as a disguise for some other thing, which the law does not permit, the courts will have no regard for the mere name, but will strip the unlawful thing of its borrowed name, and condemn it by its true name."

In Grannis v. Stevens, 216 N. Y. 583, on page 591, 111 N. E. 263, 266, Judge Collin, referring to the transaction there under consideration, said:

"A transaction of the character of the agreement of employment between the brother and the plaintiff may be a mere device or subterfuge to conceal usury and be assailed as and found to be such. If the court can see that the real transaction was a loan or forbearance of money at usurious interest, its plain and imperative duty is to so declare and hold the security void."

See, also, London Realty Co. v. Riordan, 148 App. Div. 854, 133 N. Y. Supp. 595; Andrews v. Pond, 13 Pet. 65, 10 L. Ed. 61.

Mr. Justice Lurton, in Houghton, Rec'r, v. Burden, 228 U. S. 161, at page 170, 33 Sup. Ct. 491, 494 (57 L. Ed. 780), said:

"The instrument upon its face is not usurious. Of course, if the service to be rendered should be made to appear trivial and of no real importance,

the inference might be drawn that the agreement in that particular was a sham and device to cover a mere usurious contract."

[3] After a careful consideration of all the facts and circumstances of this case and the law applicable thereto, I am inescapably led to the conclusion that that which purports to be compensation to Lowenstein Bros. for services to be rendered by them must be regarded as interest on the loan made by M. Lowenstein & Sons, Inc., and that it was intended by the parties as such. Though in theory the Lowenstein corporation is to be regarded as an entity apart from the persons who were a part of it, this fiction will be disregarded, where a recognition of it would permit the perpetration of a fraud. The brothers Lowenstein appear to have had entire control of the corporation of M. Lowenstein & Sons, Inc., and payment to them must be regarded as payment to that corporation. In United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 Fed. 247, the United States sought an injunction to prevent the payment of rebates on freight to shippers, in violation of the Elkins Act of 1903 (Comp. St. §§ 8597–8599). In that case the Pabst Brewing Company caused a transportation company to be formed, most of the stockholders and directors of which were stockholders and officers of the brewing company. The brewing company then entered into an agreement with the transportation company whereby the brewing company gave the transportation company exclusive control of the routing and shipping of the freight of the former over the various railroads. The transportation company received compensation from the railroads over which the freight was routed, and it was these payments which the government claimed were rebates to the shipper, the Pabst Brewing Company, and not compensation to the transportation company as soliciting agent of the railroads. The injunction was granted. On page 254 Judge Sanborn cited and quoted from Railway Co. v. Whitton, 13 Wall. 270, 20 L. Ed. 571:

"It is true that for certain purposes the law will recognize the corporation as an entity distinct from the individual stockholders: but that fiction is only resorted to for the purpose of working out the lawful objects of the corporation. It is never resorted to when it would work an injury to any one, or allow the corporation to perpetrate a fraud upon anybody."

And on page 255, after summarizing the numerous authorities cited, he says:

"If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."

For other cases adopting the same principle, see Linn Timber Co. v. United States, 236 U. S. 574, 35 Sup. Ct. 440, 59 L. Ed. 72; First Nat. Bank v. Trebein Co., 59 Ohio St. 316, 52 N. E. 834; New York & Brooklyn Ferry Co. v. New York, 146 N. Y. 145, 40 N. E. 785.

[4] Having thus reached the conclusion that the sums received by M. Lowenstein & Sons, Inc., and Lowenstein Bros. were interest for the use of the money loaned by the former, the question next to be considered is whether the agreement under which these sums were ob-

tained was prohibited by the Connecticut statutes. The plaintiff contends that, since the amount to be obtained was contingent on sales being made by the British-American Manufacturing Company, the agreement was not for interest in excess of 12 per cent. There is no merit in this contention. In Douglass v. Boulevard Co., supra, the amount to be paid in excess of 6 per cent. interest was contingent on the sale of the automobiles and trucks, and it does not appear that that was considered as material. In interpreting the Connecticut statutes to determine whether the agreement was to obtain interest in excess of 12 per cent. allowed, I am bound by the decisions of the court of the state wherein the statute was enacted. The offense, as I see it in the light of the decisions cited, consists in the making of the agreement by which it is contemplated that a sum in excess of the amount authorized will be obtained.

This view is not peculiar to Connecticut. It has been adopted by the courts of New York in several decisions. In Cleveland v. Loder & Draper, 7 Paige, 557, it was said:

"Upon a contract for the loan of money, the lender is not at liberty to stipulate even for a contingent benefit beyond the legal rate of interest, if by the terms of the agreement he has the right to demand a repayment of the money lent, with the legal interest thereon, at all events."

The ruling in this case was approved in Thomas v. Murray, 34 Barb. 157. There the money loaned was secured by a transfer of stocks and it was made a condition of the loan that the lender should have the option to retain the stocks with the dividends at the market value of the stock at the time of making the loan, or to receive back his money with the interest thereon at the time appointed for payment. The contract was held to be usurious and the court said:

"Whenever the lender stipulates even for the chance of an advantage beyond the legal interest the contract is usurious, if he is entitled by the contract to have the money lent with the interest thereon repaid to him at all events. Barnard v. Young, 17 Vesey, 44; Chippendale v. Thurston, 4 Car. & Payne, 101; White v. Wright, 3 Barn. & Cress. 276."

In Scott v. Fabacher, 176 Fed. 229, 100 C. C. A. 147, the plaintiff sought to have a note canceled, and a sale under a mortgage deed declared void under the terms of a Texas usury statute. There the defendant had loaned the plaintiff $15,000 with which to purchase land, and the plaintiff had promised to pay the defendant three-fifths of a profit of $10,000, which the plaintiff expected to make on the resale of the land. The expected profit was made. The plaintiff gave the defendant a note for $6,000, and it was for nonpayment of this note that the mortgage had been foreclosed. The agreement was held usurious, the note was canceled, and the mortgage sale declared void. The court approved the decision in Browne v. Vredenburgh, 43 N. Y. 197, that:

"When a lender stipulates for a contingent benefit beyond the legal rate of interest, and has the right to demand the repayment of the principal sum with the legal interest thereon, in any event, the contract is in violation of the statute prohibiting usury, and void."

The cases cited by the plaintiff are not such authority as lead to the opposite conclusion. Such cases are decisions on entirely dissimilar

facts, or on statutes differing materially from those in Connecticut. Thus Clift v. Barrow, 108 N. Y. 187, 15 N. E. 327, merely construes as a partnership agreement a certain agreement to take 10 per cent. of the amount of the plaintiff's deposits with a certain firm if the profits should equal that amount. There the plaintiff was to get no return for the money deposited unless there should in fact be profits. In the present case, the plaintiff in any event was to get 6 per cent. interest and Lowenstein Bros. were to get $7,400 salary. In Sumner v. People, 29 N. Y. 337, the agreement was that, "if I do not pay Sumner the $800, I owe him by December 5th, I will give him $16 extra." The court held that since the debtor, by paying the principal before the date set, could discharge himself from the obligation to pay the additional $16, the agreement was not usurious. The $16 in that case was in the nature of a penalty for failure to perform the agreement. There is nothing in that case inconsistent with the view I adopt; nor is there in American Freehold Land Mortgage Co. v. Whaley (C. C.) 63 Fed. 745, nor in Spain v. Hamilton's Administration, 1 Wall. 604, 17 L. Ed. 619. In the present case, in order for the British-American Manufacturing Company to avoid paying the 5 per cent. commission, it would have had to refuse to make sales; that is, to discontinue the business. It can scarcely be maintained that this gave the British-American Manufacturing Company a real option to determine whether it should or should not pay the added interest.

[5] Thus far the contract appears to be in violation of section 4798 of the General Statutes, Revision of 1918. But the plaintiff claims that section 4798 does not apply to this loan; that it falls within the exception set out in section 4803, as amended by chapter 118, Laws of 1921, as a bona fide mortgage on real property exceeding the sum of $500. Even apart from the fact that the mortgage now sought to be foreclosed embraces personalty—i. e., machinery in the plant—I cannot agree that the exception includes this transaction. The mortgage was but a part of a larger transaction. The loan, as I have shown, was not made on a mortgage of real property, but on a mortgage together with an agreement to pay an additional compensation. The mortgage and agreement I regard as a single and inseparable transaction, and the present action arising from the negotiations of that loan (assuming that the Connecticut statutes are applicable) is prohibited by section 4802, providing that:

"No action shall be brought to recover principal or interest or any part thereof on any loan prohibited by sections 4798, 4799 and 4800 *or upon any cause arising from the negotiation of such loan.*"

[6] This, then, brings me to the question of what law is to govern in this case. Chapter 213 of the Laws of Delaware for the year 1915, article 2621, § 1, is entitled:

"An act to amend chapter 77 of the Revised Code of the state of Delaware, being an act relating to the rate of interest for the use of money."

It provides, inter alia:

"That no corporation shall hereafter interpose the defense of usury in any action."

The plaintiff contends that this statute must be read in connection with the charter of the defendant company as a part of it, and that under the terms of this statute of the state from which the company obtained its charter the defendant is precluded from pleading usury. It is true that some of the statutes of the state under which a corporation is organized must be considered in determining what acts a corporation is permitted to perform and what acts are prohibited. But all the laws of the state of incorporation are not to be read as part of the charter and as limitations on the action of the company, wherever it may seek to do business.

The title of the statute set forth above indicates that it is an act relating to interest for the use of money. The provision that no corporation should, after the passage of that act, interpose the defense of usury, is not limited to corporations organized under the laws of Delaware, but presumably applies to any corporation, wherever organized, sued in that state. The statute, therefore, appears to be intended to apply only within the state of Delaware, and to be for the protection of plaintiffs suing for the recovery of money loaned in that state to corporations.

A somewhat analogous situation may be found in the case of White et al., Executors, v. Howard et al., 38 Conn. 342. In that case a testator domiciled in Connecticut devised land to a New York corporation. The New York statute of wills declared invalid devises to corporations, not expressly authorized by its charter or by statute to take by devise. It was therefore contended that the corporation there involved, being not so authorized, could not take the Connecticut lands. Considering this point, Judge Foster, speaking for the court, said on page 361:

"It is not expressly authorized to take by devise, nor is it prohibited from so taking. Can it, then, take by devise? Not in New York, as we have seen. Therefore not in Connecticut, say the counsel for the heirs at law, for being a New York corporation, and by the law of that state devoid of power to take by devise, no argument is needed to show its inability to take by devise in Connecticut. This conclusion is too hastily drawn. If the inability to take by devise arose out of a prohibitory clause in the charter, the conclusion would be legal and logical. But the inability does not so arise. There is no prohibition in the charter; the inability is created by the New York statute of wills, expressly excepting corporations from taking by devise. Now this corporation brings with it from New York its charter, but it does not bring with it the New York statute of wills, and cannot bring it to be recognized as law within this jurisdiction. There is an obvious distinction between an incapacity to take created by the statute of a state, which is local, and a prohibitory clause in the charter, which everywhere cleaves to the corporation. The reasoning is fallacious, not recognizing this distinction. There being no prohibition in the charter, and the power to hold and convey real estate being expressly given, we must look to our own statutes and laws, and not to those of New York, to determine whether or not this corporation can take by devise in Connecticut."

The same conclusion was reached in American Bible Society et al. v. Marshall et al., 15 Ohio St. 537. At page 543 the court said:

"Indeed, it seems to us, it cannot, in reason, be claimed that the New York statute of wills can operate beyond the extent to which it was applied upon the facts of that case. [The court here refers to a New York case where it was held that the corporation could not take by devise lands situated in New York.] It is a statute of wills. Its primary intent is to limit the capac-

ity of testators to devise; and it is only incidentally that it affects the capacity of corporations to take by devise. * * * Now, the New York statute of wills operates on property situated in, and controlled by the laws of, that state. Beyond the limits of that state it can have no effect. It is not to be presumed that the Legislature of that state intended to go further; and, if it so intended, the assumption would be nugatory."

See, also, Thompson v. Swoope, 24 Pa. 474.

In the present case, the statute of the state of Delaware sought to be invoked was primarily a law relating to usury. As such it could have no effect beyond the limits of the state of Delaware. The contracts here involved were not made in Delaware, and were not in any part to be performed in Delaware. This Delaware statute, therefore, has no bearing on the case. United Divers Supply Co. v. Commercial Credit Co. (C. C. A.) 289 Fed. 316, 319.

[7] The final stronghold of the plaintiff is the claim that this is a New York contract, and that the laws of New York, which, like the laws of Delaware, provide that no corporation shall plead usury, are to govern. The defendant, on the other hand, says it is a Connecticut contract, and the Connecticut law is to govern. After a careful examination of the testimony I find the following facts:

Negotiations for the consummation of this transaction were held both in Connecticut and New York. The agreement relating to the employment of Lowenstein Bros. and the mortgage deed were signed in New York City, but the bond and mortgage were witnessed in Connecticut and were first acknowledged there, and the mortgage was delivered to Judge Brinckerhoff in Stamford, Conn., for the purpose of having it recorded. Though the notes for the repayment of the $125,-000 were payable at a New York bank, it does not appear where payment was to be made for the "services" of Lowenstein Bros. The agreement recites that a check was to be mailed. Apparently this meant that a check was to be mailed from the offices of the British-American Manufacturing Company at the plant in Springdale, Conn. Obviously, neither the mailing nor the receipt of the check would operate as payment, since, if it happened that the checks were dishonored by the bank on which they were drawn, Lowenstein Bros. would not consider themselves paid. It is not stated on what bank they were to be drawn. Nor does it appear where the "services" were to be rendered. Probably no definite place was intended for their rendition; that is, assuming that any services at all were contemplated. Mr. Leon Lowenstein testified that he sent a man to the plant in Springdale, Conn., to make certain suggestions there as to the operation of the business of the British-American Manufacturing Company.

Nor can any assistance in determining the situs of the contract be obtained by investigating the intention of the parties. The intention appears to have been to contract with respect to the laws of Connecticut as much as to those of New York and vice versa. Thus Mr. Canter, of the attorneys for the plaintiff, carried with him to Stamford the check for $55,000, the last installment of the loan, to deliver it there. It was only through the accident that the title had not been fully investigated at that time that the check was not delivered until the next day in New York. Though the agreement for the employment of

Lowenstein Bros. was executed in New York, as stated previously in this opinion, this agreement did not represent the true intention of the parties. Behind this agreement there must have been another agreement, presumably oral, in which the real intent of the parties was expressed. Whether this agreement was reached in Connecticut or New York, it is, of course, impossible to state.

The arrangement, therefore, appears to have been both a New York transaction and a Connecticut transaction—neither one more than the other. The only decision I have been able to find covering such a situation is the case of Cockle et al. v. Flack et al., 93 U. S. 344, 33 L. Ed. 949. There the borrower was a resident of Illinois; the lender was a resident of Maryland. The agreement for a loan was made by letter. To recover on the loan, an action was brought by the lender in the Circuit Court of the United States for the Northern District of Illinois. The Supreme Court decided that, since the contract was as much an Illinois contract as a Maryland contract, the law of Illinois, which was the law of the forum, should govern. In Perley on Law of Interest, at page 191, we find this clear and concise statement which is in accord with the ruling in the Cockle Case, supra:

"Where a loan is made by a party in one state to a party in another state, to be used in the other state, which is also the forum, the law of the latter place governs."

Upon the authority of Cockle v. Flack, supra, I must hold that the law of Connecticut is to control, and that, since that law prohibits the bringing of this action, the decree must be for the defendants, with costs to abide the event; and it is so ordered.